**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

EVE WEXLER, on behalf of herself and all others similarly situated,

                            Plaintiff,

            v.

                                                                   15-CV-0686 (FB/VVP)

AT&T CORP.,

                            Defendant.

------------------------------------------------------------x

**DEFENDANT AT&T CORP.'S REPLY IN SUPPORT OF ITS**
**MOTION TO COMPEL ARBITRATION**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES .................................................................................................... ii

    A.    AT&T's Evidence Establishes That Dr. Wexler Entered Into An Arbitration Agreement That Is Enforceable Under The FAA ............................... 1

    B.    The Arbitration Agreement Applies To Claims Dr. Wexler Has Against Defendant AT&T Corp. Because It Is An Affiliate Of AT&T Mobility LLC ..................................................................................................................... 4

    C.    Dr. Wexler's TCPA Claims Are Covered By Her Arbitration Agreement ........... 5

    D.    Dr. Wexler's Change To Month-To-Month Service Does Not Alter Her Continuing Obligation To Arbitrate Her Disputes.................................................. 7

    E.    The "Changes-In-Terms" Clause In The Contract Is Valid And Does Not Render The Arbitration Agreement Illusory And Unenforceable ......................... 9

CONCLUSION............................................................................................................................ 11

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Andermann v. Sprint Spectrum L.P.*, 785 F.3d 1157 (7th Cir. 2015) ..........................................8, 9

*In re Apple & AT&TM Antitrust Litig.*, 826 F. Supp. 2d 1168 (N.D. Cal. 2011) ............................4

*In re Apple iPhone 3G Prods. Liab. Litig.*, 859 F. Supp. 2d 1084 (N.D. Cal. 2012) ......................4

*Aramony v. United Way*, 254 F.3d 403 (2d Cir. 2001) ...................................................................6

*AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011) .....................................................4, 10

*AT&T Mobility LLC v. Gonnello*, 2011 WL 4716617 (S.D.N.Y. Oct. 7, 2011)...............................6

*Bank of Am., N.A. v. Diamond State Ins. Co.*,
    2002 WL 31720328 (S.D.N.Y. Dec. 4, 2002) ...........................................................................8

*Bassett v. Elec. Arts Inc.*, 2015 WL 1298644 (E.D.N.Y. Feb. 9, 2015) ...........................................4

*Blau v. AT&T Mobility*, 2012 WL 566565 (N.D. Cal. Feb. 21, 2012) ............................................3

*Boyer v. AT&T Mobility Servs., LLC*,
    2011 WL 3047666 (S.D. Cal. July 25, 2011) ............................................................................4

*Cape Flattery Ltd. v. Titan Maritime, LLC*, 647 F.3d 914 (9th Cir. 2011).....................................7

*Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202 (5th Cir. 2012) .............................................10

*Carvant Fin. LLC v. Autoguard Advantage Corp.*,
    958 F. Supp. 2d 390 (E.D.N.Y. 2013) .......................................................................................2

*Clay v. New Mexico Title Loans, Inc.*, 288 P.3d 888 (N.M. Ct. App. 2012) ...................................7

*Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511 (10th Cir. 1995) ......................................7

*Coppock v. Citigroup, Inc.*, 2013 WL 1192632 (W.D. Wash. Mar. 22, 2013)................................6

*Craddock v. Beats Music, LLC*, 2015 WL 4960041 (N.D. Ill. Aug. 19, 2015) ...............................9

*Douglas v. Johnson Real Estate Inv'rs, LLC*, 470 F. App'x 823 (11th Cir. 2012).......................10

*Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, 141 F.3d 243 (5th Cir. 1998)........................7

*Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287 (2010) ................................................4

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Green Tree Servicing, L.L.C. v. Fisher*, 162 P.3d 944 (Okla. Civ. App. 2007) ..............................7

*Hancock v. Am. Tel. & Tel. Co.*, 2011 WL 3626785 (W.D. Okla. Aug. 11, 2011) .......................10

*Hendricks v. AT&T Mobility, LLC*, 823 F. Supp. 2d 1015 (N.D. Cal. 2011) .................................4

*Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362 (E.D.N.Y. 2009) ...........................................10

*In re Jiffy Lube International, Inc., Text Spam Litigation*,
    847 F. Supp. 2d 1253 (S.D. Cal. 2012) ....................................................................................6

*Joseph v. TrueBlue, Inc.*, 2015 WL 575289 (W.D. Wash. Feb. 11, 2015) ..................................5, 7

*Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559 (9th Cir. 2014) .....................................................4

*Laumann v. Nat'l Hockey League*, 989 F. Supp. 2d 329 (S.D.N.Y. 2013) .....................................5

*Mionis v. Bank Julius Baer & Co.*,
    2002 WL 34184957 (N.Y. Sup. Ct. Feb. 6, 2002) ....................................................................8

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983)..................................6

*O'Conner v. AT&T Corp.*, 2013 WL 3107496 (M.D. La. June 18, 2013) ......................................4

*Oppenheimer & Co. v. Neidhardt*, 56 F.3d 352 (2d Cir. 1995) ......................................................2

*Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627 (2d Cir. 1994) ..........................3

*Ragone v. Atl. Video at Manhattan Ctr.*,
    2008 WL 4058480 (S.D.N.Y. Aug. 29, 2008) .........................................................................5

*Riensche v. Cingular Wireless, LLC*,
    2006 WL 3827477 (W.D. Wash. Dec. 27, 2006) ...................................................................10

*Riley Mfg. Co. v. Anchor Glass Container Corp.*, 157 F.3d 775 (10th Cir. 1998) .........................7

*Roling v. E*Trade Sec., LLC*, 756 F. Supp. 2d 1179 (N.D. Cal. 2010) ........................................10

*Sadowski v. Dell Computer Corp.*, 268 F. Supp. 2d 129 (D. Conn. 2003) ...................................10

*Saks Int'l, Inc. v. M/V Export Champion*, 817 F.2d 1011 (2d Cir. 1987) ......................................3

*Schnabel v. Trilegiant Corp.*, 697 F.3d 110 (2d Cir. 2012) ......................................................4, 10

*Seifert v. U.S. Home Corp.*, 750 So.2d 633 (Fla. 1999) .................................................................7

## TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Sherrod v. Time Warner Cable, Inc.*,
    2014 WL 6603879 (S.D.N.Y. Nov. 21, 2014) .......................................................................... 7

*Smith v. Steinkamp*, 318 F.3d 775 (7th Cir. 2003) .................................................................. 8, 9

*Valle v. ATM Nat'l, LLC*, 2015 WL 413449 (S.D.N.Y. Jan. 30, 2015) ......................................... 10

**STATUTES, RULES AND REGULATIONS**

9 U.S.C. §§ 1-16 ............................................................................................................................ 1

In opposing arbitration, Dr. Wexler resorts to arguments that are either irrelevant or contrary to the undisputed facts and the governing law. For example, she asserts that she did not agree to arbitrate. Yet she does nothing to refute AT&T's showing that, after being presented with the terms and conditions of her wireless service agreement, she affirmatively assented to those terms, including the arbitration provision. Nor has she produced evidence controverting AT&T's showing that she received notice, and an opportunity to opt out, of the revised arbitration clause through her monthly bills.

Moreover, throughout her opposition, Dr. Wexler points to cases that may reach the results she desires, but were based upon facts and reasoning that are inapplicable here. Most significantly, in arguing that her TCPA claims are outside the scope of her arbitration agreement, she points to cases interpreting arbitration provisions that were far narrower in scope than AT&T's provision, which covers—without exception—"all disputes and claims between us." Similarly, she ignores the fact that the term "us" in AT&T's provision is expressly defined to include "affiliates" of AT&T Mobility, and she does not deny that Defendant AT&T Corp. is an affiliate of AT&T Mobility. Because the explicit language of the arbitration provision encompasses all claims, including statutory claims, that relate in any way to the relationship between Dr. Wexler and AT&T Mobility and its affiliates, including AT&T Corp., Dr. Wexler's dispute is well within the scope of that provision. That is especially so in light of the well-established rule that under the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA"), all doubts concerning the scope of arbitrable disputes must be resolved in favor of arbitration.

**A.   AT&T's Evidence Establishes That Dr. Wexler Entered Into An Arbitration Agreement That Is Enforceable Under The FAA.**

Dr. Wexler contends that AT&T failed to show that she entered into a service agreement containing an arbitration provision. But apart from a conclusory denial that she accepted the

1

terms and conditions of the agreement (Opp. 2 & Wexler Aff. ¶ 18), Dr. Wexler does not deny any of the operative facts brought forward by AT&T. It is established law that, once AT&T satisfies its "initial burden of showing that an agreement to arbitrate exists" (*Carvant Fin. LLC v. Autoguard Advantage Corp.*, 958 F. Supp. 2d 390, 395 (E.D.N.Y. 2013)), it is "not sufficient for the party opposing arbitration to utter general denials of the facts on which the right to arbitration depends" (*Oppenheimer & Co. v. Neidhardt,* 56 F.3d 352, 358 (2d Cir. 1995)).

Specifically, in support of its motion to compel arbitration, AT&T provided evidence that, on October 29, 2008, Dr. Wexler accepted the terms and conditions of the wireless service agreement on AT&T's Premier business-direct website. Plourde Decl. ¶¶ 4-5 & Ex. 1.[1] That evidence is competent and admissible because it: (i) comes from the personal knowledge of someone "familiar with the manner in which those agreements and records pertaining to customers' accounts are stored in the regular and ordinary course of business and may be retrieved" (*id.* ¶¶ 1-2); (ii) is based on that individual's "review of the records for [Dr. Wexler's] account" (*id.* ¶ 3); and (iii) is supported by business records relating to Dr. Wexler (*id.* Ex. 1). AT&T also provided evidence of the content of the wireless service agreement that Dr. Wexler accepted on its website. Bates Decl. ¶ 4 & Ex. 2. That evidence is likewise admissible; it is established through the personal knowledge of someone who has been in charge of the e-commerce web site on which Dr. Wexler accepted the contract "for many years, including from October 2008 to the present" (*id.* ¶¶ 1-2) along with the supporting records (*id.* Ex. 2).

Moreover, AT&T provided evidence that direct-billed customers like Dr. Wexler were sent a revised arbitration provision in March 2009, as well as evidence of the content of that arbitration provision. White Decl. ¶ 3 & Ex. 1. Once again, those facts are established through

---

[1] Dr. Wexler's affidavit does not actually deny that she accepted AT&T's service agreement on October 29, 2008—the date on which Ms. Plourde explains that the service agreement was accepted on AT&T's web site. Instead, Dr. Wexler says: "I deny that on October *28*, 2008, I accepted Mobility's service agreement." Wexler Aff. ¶ 18 (emphasis added). We assume that this was merely an inadvertent drafting error.

2

the personal knowledge of someone "familiar with the policies and procedures by which ATTM generates and distributes inserts to the bills sent to its direct-billed customers" (*id.* ¶¶ 1-2) along with the supporting records (*id.* & Ex. 1). Finally, AT&T offered evidence that Dr. Wexler was sent direct bills in March, April, and May 2009, each of which included a heading at the top stating "**NOTICE OF REVISED ARBITRATION CLAUSE IN CONTRACT**" and provided Dr. Wexler directions for obtaining additional information. Plourde Decl. ¶ 7 & Exs. 5, 6, 7.

Dr. Wexler offers no evidence of her own to controvert AT&T's showing, other than making a conclusory denial that, as shown above, is entitled to no weight. Instead, she attempts to undermine the sufficiency of the declarations and exhibits provided by AT&T. Some of her assertions are patently false—*e.g.*, that "none of these three declarations even mention regular business practice." Opp. 7. Others are simply frivolous—*e.g.*, that the wireless service agreement that was displayed on AT&T's website, should be rejected because it begins with "unintelligible, internally inconsistent gibberish." Opp. 9 (citing Bates Decl. Ex. 2). In fact, the so-called "gibberish" is simply the computer coding language used for web sites. And Dr. Wexler admits that "computer-generated data is appropriate for treatment under 803(b), even if it is later printed out." Opp. 11 (citing *Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627, 632 (2d Cir. 1994)). The records provided by AT&T meet that standard; they have been retrieved from AT&T's business records and plainly "have sufficient indicia of trustworthiness to be considered reliable." *Saks Int'l, Inc. v. M/V Export Champion*, 817 F.2d 1011, 1013 (2d Cir. 1987).[2] Indeed, courts across the country regularly compel arbitration based on materially identical declarations and exhibits establishing the plaintiff's assent to these arbitration clauses. *See, e.g.*, *Blau v. AT&T Mobility*, 2012 WL 566565, at *1 (N.D. Cal. Feb. 21, 2012) (compelling

---

[2] The cases Dr. Wexler cites involving a party who could produce only part of the alleged contract or could not establish that the other party actually signed the contract (Opp. 12-13) are inapposite. AT&T has demonstrated that (1) Dr. Wexler assented to the complete wireless service agreement and (2) Dr. Wexler received adequate notice of the complete revised arbitration provision. *See* pages 2-3, *supra*.

3

arbitration based on similar declarations and exhibits, including a declaration by Ms. Plourde).[3]

Finally, Dr. Wexler contends that "checking a box is not sufficient to create an arbitration agreement." Opp. 13-14 (initial capitalization removed) (citing *Schnabel v. Trilegiant Corp.*, 697 F.3d 110 (2d Cir. 2012)). But none of the cases she cites involves clickwrap agreements like AT&T's, in which the terms were presented to Dr. Wexler on AT&T's website and she affirmatively assented to them. As Judge Brodie recently recognized, "[f]ederal courts have consistently enforced clauses contained in clickwrap agreements." *Bassett v. Elec. Arts Inc.*, 2015 WL 1298644, at *4-7 (E.D.N.Y. Feb. 9, 2015) (collecting cases and explaining that "[t]he facts at issue here are markedly different from those in *Schnabel* …, and involve neither inadequate notice nor merely passive assent"), *report & rec. adopted*, 2015 WL 1298632 (E.D.N.Y. Mar. 23, 2015).[4]

### B. The Arbitration Agreement Applies To Claims Dr. Wexler Has Against Defendant AT&T Corp. Because It Is An Affiliate Of AT&T Mobility LLC.

Dr. Wexler concedes that "'arbitration is a matter of contract.'" Opp. 3 (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010)); *see also, e.g.*, *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1748 (2011) ("The overarching purpose of the FAA … is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings."). And Dr. Wexler does not—and could not—deny that the revised arbitration provision (as well as the provision in her original service agreement) states that:

> AT&T and you agree to arbitrate **all disputes and claims** between us. … References to "AT&T," "you," and "us" include our respective subsidiaries,

---

[3] *See also, e.g.*, *O'Conner v. AT&T Corp.*, 2013 WL 3107496, at *2-*3 (M.D. La. June 18, 2013); *In re Apple iPhone 3G Prods. Liab. Litig.*, 859 F. Supp. 2d 1084, 1093-97 (N.D. Cal. 2012); *In re Apple & AT&TM Antitrust Litig.*, 826 F. Supp. 2d 1168, 1174-75 (N.D. Cal. 2011); *Hendricks v. AT&T Mobility, LLC*, 823 F. Supp. 2d 1015, 1019-23 (N.D. Cal. 2011); *Boyer v. AT&T Mobility Servs., LLC*, 2011 WL 3047666, at *3 (S.D. Cal. July 25, 2011).

[4] *Schnabel* involved the question whether an e-mail sent *after* contract formation, and without a reasonable expectation that it contained contract terms, was sufficient to provide notice. 697 F.3d at 126-27. The other case Dr. Wexler cites involved a contract that was mailed out over a month after the three-day window for canceling the contract. *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 564 (9th Cir. 2014).

4

affiliates, agents, employees, predecessors in interest, successors, and assigns ….

White Decl. Ex. 1 § 1; *see also* Bates Decl. Ex. 2 at 10. Finally, Dr. Wexler does not dispute that defendant AT&T Corp. is an affiliate of AT&T Mobility. *See* Begue Decl. ¶ 5.[5] Thus, the plain language of the arbitration clause encompasses claims by Dr. Wexler against AT&T Corp.

Because the arbitration clause itself requires Dr. Wexler to arbitrate disputes against AT&T Corp., the cases on which she relies (Opp. 14-19) are irrelevant. Those cases address the question, not presented here, whether an entity that is *not* encompassed within the language of an arbitration provision nevertheless can invoke that provision through the legal doctrine of equitable estoppel. *See, e.g.*, *Ragone v. Atl. Video at Manhattan Ctr.*, 2008 WL 4058480, at *8 (S.D.N.Y. Aug. 29, 2008) ("The defendants maintain that the plaintiff must be compelled to submit to arbitration with ESPN under the common law theory of equitable estoppel."), *aff'd* 595 F.3d 115 (2d Cir. 2010).[6] Here, it is unnecessary (and would be improper) to look beyond the explicit contract language to such common-law legal doctrines.

### C. Dr. Wexler's TCPA Claims Are Covered By Her Arbitration Agreement.

Dr. Wexler cannot deny that the plain language of the arbitration provision requires arbitration of "**all disputes and claims** between us." White Decl. Ex. 1 at 2. That extremely broad formulation "includes, but is not limited to … claims arising out of or relating to any aspect of the relationship between us," including those claims "based in … statute." *Id.* Dr. Wexler's claims are unquestionably covered by this broad language. She alleges that she received calls and text messages from an affiliate of AT&T Mobility (AT&T Corp.) on her

---

[5] Dr. Wexler points out that "AT&T Corp. does not own Mobility, is not its parent company, an officer, shareholder, manager, employee, shareholder, or agent." Opp. 15. But she carefully omits from her list the relationship that actually does exist and that AT&T has demonstrated: the "affiliate" relationship.

[6] *See also Joseph v. TrueBlue, Inc.*, 2015 WL 575289, at *1, *3 (W.D. Wash. Feb. 11, 2015) (parent company could not enforce arbitration agreement under doctrines of equitable estoppel or "indirect beneficiary" where arbitration provision mentioned only subsidiary and contract contained only an unrelated and "indirect" reference to parent); *Laumann v. Nat'l Hockey League*, 989 F. Supp. 2d 329, 339-40 (S.D.N.Y. 2013) (analyzing question of arbitrability under "a theory of estoppel" because "the text of the DIRECTV arbitration clause does not expressly encompass [the plaintiffs'] claims against the Comcast Defendants").

5

AT&T Mobility phone through wireless service she receives from AT&T Mobility. Such claims plainly "aris[e] out of or relat[e] to" an "aspect of the relationship between" Dr. Wexler and both AT&T Corp. and AT&T Mobility. Moreover, the "arise out of or relate to" language is but a subset of the broader agreement to arbitrate, without limitation, "**all disputes and claims between us.**" Further, as a matter of federal law under the FAA, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

In response, Dr. Wexler argues that the scope of her arbitration agreement is narrowed by language in the "[s]ummary" stating that many disputes can be resolved through AT&T's customer service department. Opp. 20. But such introductory language does not limit the scope of arbitration. *See, e.g.*, *Aramony v. United Way*, 254 F.3d 403, 413 (2d Cir. 2001); *AT&T Mobility LLC v. Gonnello*, 2011 WL 4716617, at *4 (S.D.N.Y. Oct. 7, 2011) ("description of the arbitration process and how it operates [in the Summary] does not supplant the specific limitations contained in [the arbitration clause itself]").

The other cases on which Dr. Wexler relies involve different underlying facts or arbitration clauses with more limited scope. For example, she cites *In re Jiffy Lube International, Inc., Text Spam Litigation*, 847 F. Supp. 2d 1253 (S.D. Cal. 2012), in which the court refused to compel arbitration of a claim involving marketing text messages based on an arbitration clause contained in a contract to receive an oil change. Opp. 20. But other federal courts have declined to extend *Jiffy Lube* beyond that limited factual context. *See, e.g.*, *Coppock v. Citigroup, Inc.*, 2013 WL 1192632, at *5 (W.D. Wash. Mar. 22, 2013). Moreover, *Jiffy Lube* is factually worlds apart from this case, as Dr. Wexler's claims are based on calls and text messages that were allegedly sent by an AT&T Mobility affiliate to her AT&T Mobility cell

6

phone via AT&T Mobility's wireless service.

Dr. Wexler also cites a number of cases (Opp. 19-24) that involve arbitration clauses with a more limited scope—for example, requiring arbitration only of "[a]ny controversy or claim arising out of or relating to *this Agreement*." *Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, 141 F.3d 243, 246, 250-51 (5th Cir. 1998) (emphasis added).[7] The arbitration clause here is not limited to claims involving the terms of the wireless service agreement, but requires arbitration of "**all disputes and claims** between us," including "claims arising out of or relating to *any aspect of the relationship* between us." White Decl. Ex. 1 § 1 (second emphasis added). Dr. Wexler has not identified any cases addressing a similarly broad arbitration clause that would undermine the natural reading of AT&T's provision to include her dispute.

### D. Dr. Wexler's Change To Month-To-Month Service Does Not Alter Her Continuing Obligation To Arbitrate Her Disputes.

Dr. Wexler contends that her claims do not fall within the scope of the arbitration clause because she "is not currently under contract with Mobility for her cell phone and was not under contract during the time period in which AT&T Corp. made the calls and texts at issue." Opp. 3; *see also* Opp. 19-20. This argument fails for two reasons. First, while Dr. Wexler changed from a fixed-term to a month-to-month plan on September 15, 2014, the cellular service she receives is still "under her ATTM Wireless Customer Agreement." Plourde Decl. ¶ 9; *see also id.* ¶ 10

---

[7] *See also Cape Flattery Ltd. v. Titan Maritime, LLC*, 647 F.3d 914, 924 (9th Cir. 2011) (agreement limited to "disputes 'arising under' the agreement"); *Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511, 1513 (10th Cir. 1995) (agreement limited to "[a]ny dispute arising in connection with the implementation, interpretation or enforcement of this Agreement"); *Riley Mfg. Co. v. Anchor Glass Container Corp.*, 157 F.3d 775, 781 (10th Cir. 1998) (agreement limited to "disputes that 'arise under' that Manufacturing Agreement and its successor agreements"); *Joseph*, 2015 WL 575289, at *1 (agreement limited to disputes "relating to my employment, application for employment, and/or termination of employment, this Agreement, or the breach of this Agreement"); *Sherrod v. Time Warner Cable, Inc.*, 2014 WL 6603879, at *5-6 (S.D.N.Y. Nov. 21, 2014) (agreement limited to disputes "in connection with" the contract); *Clay v. New Mexico Title Loans, Inc.*, 288 P.3d 888, 895 (N.M. Ct. App. 2012) (agreement limited to disputes "that 'aris[e] from or relat[e] to' the Agreement or the collateral"); *Green Tree Servicing, L.L.C. v. Fisher*, 162 P.3d 944, 947 (Okla. Civ. App. 2007) (agreement limited to disputes "arising from or relating to this Agreement or the relationships which result from this Agreement"); *Seifert v. U.S. Home Corp.*, 750 So.2d 633, 635 (Fla. 1999) (agreement limited to disputes "arising under or related to this Agreement or to the Property").

7

("According to ATTM's records, Dr. Wexler's account is active and continues to receive service under a month-to-month service commitment …."). Thus, while Dr. Wexler is not "under contract" in the colloquial sense that she is not required to maintain AT&T service for a specified term, she is still receiving service from AT&T under her service agreement (including all of its terms and conditions) and the arbitration provision remains in effect.

In any event, even if the service agreement were no longer in effect, the arbitration provision in that agreement expressly states that the parties agreed to arbitrate "claims that may arise after the termination of this Agreement." White Decl. Ex. 1 § 1. Dr. Wexler does not—and could not—deny that courts routinely enforce such contract terms. *See, e.g.*, *Andermann v. Sprint Spectrum L.P.*, 785 F.3d 1157, 1159 (7th Cir. 2015); *Bank of Am., N.A. v. Diamond State Ins. Co.*, 2002 WL 31720328, at *3 (S.D.N.Y. Dec. 4, 2002).[8]

The case on which Dr. Wexler chiefly relies, *Smith v. Steinkamp*, 318 F.3d 775 (7th Cir. 2003), is not to the contrary. *See* Opp. 19-20. The arbitration clause at issue in *Steinkamp* (involving a series of separate payday loans) expressly applied ***only*** to "the current loan agreement or a prior loan agreement," not a future agreement. 318 F.3d at 777. As Judge Posner subsequently explained, his opinion in *Steinkamp* was limited to the question whether an arbitration agreement in one contract could be expanded to encompass disputes involving a different contract that has no arbitration agreement. *See Andermann*, 785 F.3d at 1159 (compelling arbitration for TCPA claims that arose after termination of a wireless service agreement). In the language Dr. Wexler cites, *Steinkamp* was simply stating that "'absurd results' would ensue if the arising-from and relating-to provisions contained in a payday loan agreement … were … applied to a subsequent payday loan agreement that did not contain those

---

[8] Courts consistently hold that an arbitration agreement survives termination of the contract in which it is included even when (unlike here) the contract does not explicitly say so. *See, e.g.*, *Mionis v. Bank Julius Baer & Co.*, 2002 WL 34184957 (N.Y. Sup. Ct. Feb. 6, 2002).

8

provisions").[9]  Here, AT&T is not attempting to apply Dr. Wexler's arbitration agreement to a dispute arising under a different contract (and, in any event, the arbitration provision here does not contain the same "arising from" or "relating to" limiting language present in *Steinkamp*). Accordingly, just as the Northern District of Illinois recently held, "*Steinkamp* does not apply here, as [the plaintiff's] claims fall within the scope of a single dispute resolution agreement." *Craddock v. Beats Music, LLC*, 2015 WL 4960041, at *5 n.4 (N.D. Ill. Aug. 19, 2015).

### E. The "Changes-In-Terms" Clause In The Contract Is Valid And Does Not Render The Arbitration Agreement Illusory And Unenforceable.

Dr. Wexler asserts that the change-in-terms clause in her service agreement renders her obligation to arbitrate unenforceable because it "provides no practical limit on Mobility's ability to make unilateral changes to the arbitration agreement." Opp. 24 (citing Bates Decl. Ex. 2 at 6). On the contrary, the arbitration clause empowers the customer to *reject* any further changes AT&T might make, and instead require AT&T to arbitrate under the existing terms:

> Notwithstanding any provision in this Agreement to the contrary, we agree that if AT&T makes any future change to this arbitration provision … during your Service Commitment, you may reject any such change by sending us written notice within 30 days of the change to the Arbitration Notice Address provided above. By rejecting any future change, you are agreeing that you will arbitrate any dispute between us in accordance with the language of this provision.

Bates Decl. Ex. 2 at 12. Thus, it is AT&T's *customers*, like Dr. Wexler, who have the right to reject any future changes AT&T might make to the arbitration provision.

Moreover, AT&T's evidence establishes that Dr. Wexler was sent a copy of the revised

---

[9] Tellingly, Dr. Wexler's brief in opposition characterizes *Steinkamp* using exactly the same language as the plaintiffs' brief in *Andermann*—language that Judge Posner recently criticized. Compare Opp. 19 ("the *Steinkamp* panel went further and stated that allowing the arbitration clause in the payday loan agreement to apply to statutory and tort claims arising after the transactions regarding that loan were completed would lead to 'absurd results.'") with *Andermann*, 785 F.3d at 1159 ("'[Plaintiffs] say we said [in *Steinkamp*] ''that allowing the arbitration clause in the payday loan agreement to apply to statutory and tort claims arising after the transactions regarding that loan were completed would lead to 'absurd results.''' The quotation is from the Andermanns' brief; the only term quoted from the [*Steinkamp*] opinion is 'absurd results.' ***What we said … differs totally from the Andermanns' characterization of what we said***[.]'") (emphasis added). Dr. Wexler appears to have selectively lifted language from the Andermanns' brief without telling this Court about the frosty reception that the brief received in the Seventh Circuit.

9

arbitration provision (*see* pages 2-3, *supra*), and thus had 30 days to reject its terms in favor of the arbitration agreement in her original wireless service agreement. Because Dr. Wexler did not exercise her contractual right to opt out of the revised provision and continued to use AT&T's service, she is bound by the terms of the revised provision. *See, e.g.*, *Valle v. ATM Nat'l, LLC*, 2015 WL 413449, at *3 (S.D.N.Y. Jan. 30, 2015) ("it is evident that plaintiffs assented to the Amended Agreement and the Arbitration Provision" because they did not opt out and continued to use account). By contrast, the cases Dr. Wexler cites involve insufficient or unreasonable notice of changes in terms or otherwise defective contracts (Opp. 24-25), and are thus all inapposite.[10] Indeed, other courts that have reviewed similar language in AT&T's arbitration clauses have concluded that the "limitations on [the company's] ability to amend the arbitration clause are sufficient to prevent the agreement to arbitrate from being rendered illusory." *Hancock v. Am. Tel. & Tel. Co.*, 2011 WL 3626785, at *7 (W.D. Okla. Aug. 11, 2011), *aff'd*, 701 F.3d 1248 (10th Cir. 2012); *see also Riensche v. Cingular Wireless, LLC,* 2006 WL 3827477, at *11 (W.D. Wash. Dec. 27, 2006), *abrogated on other grounds by Concepcion*.

---

[10]  *See, e.g.*, *Schnabel*, 697 F.3d at 127-28 ("Trilegiant effectively obscured the details of the terms and conditions and the passive manner in which they could be accepted," but "[a] requirement that the plaintiffs expressly manifest assent to the arbitration provision together with such assent would likely have overcome the email's **defects in providing notice**.") (emphasis added); *Douglas v. Johnson Real Estate Inv'rs, LLC*, 470 F. App'x 823, 825 (11th Cir. 2012) (arbitration clause was illusory under Massachusetts law because employer could "unilaterally modify the arbitration procedures **without notifying [employee]**") (emphasis added); *Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 205 (5th Cir. 2012) (arbitration clause was illusory under Texas law because employer could unilaterally cancel ongoing arbitration by removing arbitration provision from handbook retroactively); *Roling v. E*Trade Sec., LLC*, 756 F. Supp. 2d 1179, 1191 (N.D. Cal. 2010) ("a contractual provision that allows a party to unilaterally change the terms of the contract **without notice** is unenforceable") (emphasis added); *Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 367 (E.D.N.Y. 2009) (plaintiff "**lacked notice** of the Terms and Conditions because the website did not prompt her to review the Terms and Conditions and because the link to the Terms and Conditions was not prominently displayed so as to provide reasonable notice of the Terms and Conditions") (emphasis added), *aff'd*, 380 F. App'x 22 (2d Cir. 2010); *Sadowski v. Dell Computer Corp.*, 268 F. Supp. 2d 129, 136 (D. Conn. 2003) (enforcing contract terms because, even where contract gives one party unfettered discretion to decide issue without notice, "where possible, courts will imply a limited obligation of good faith or reasonableness in the exercise of such discretion to avoid an illusory promise").

## CONCLUSION

The Court should compel arbitration of Dr. Wexler's claims against AT&T and stay further litigation of those claims pending the resolution of that arbitration.


Dated: September 8, 2015                     /s/ Archis A. Parasharami
                                                    Archis A. Parasharami
                                                    Mayer Brown LLP
                                                    1999 K Street, N.W.
                                                    Washington DC, 20006-1001
                                                    Tel: (202) 263-3000
                                                    Fax: (202) 263-3300
                                                    aparasharami@mayerbrown.com

                                                    Counsel for Defendant
                                                    AT&T Corp.

## **CERTIFICATE OF SERVICE**

I, Archis A. Parasharami, hereby certify that on this 8th day of September, 2015, I caused Defendant AT&T Corp.'s Reply in Support of its Motion to Compel Arbitration to be placed with a commercial courier for overnight delivery to the following, with courtesy copies by email to the same:

James S Giardina
The Consumer Rights Law Group, PLLC
3104 W Waters Ave
Suite 200
Tampa, FL 33614
Tel.:    813-435-5055
Fax:    866-535-7199
James@ConsumerRightsLawGroup.com

Shimshon Wexler
The Law Offices of Shimshon Wexler, PC
216 West 104th Street
#129
New York, NY 10025
Tel.:    212-760-2400
Fax:    Fax: 917-512-6132
shimshonwexler@yahoo.com

                                               /s/ Archis A. Parasharami
                                                     Archis A. Parasharami