*The Law Offices of Shimshon Wexler, PC*
*315 W Ponce de Leon Ave Suite 250*
*Decatur, GA 30030*
*Tel (212)760-2400*
*Fax (917)512-6132*
swexleresq@gmail.com

September 8, 2016

VIA CM/ECF

Honorable Frederic Block
United States District Court for the
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

RE: <u>Wexler v. AT&T Corp., No. 15-cv-686 (FB-PK)</u>

Dear Judge Block:

    On behalf of Plaintiff Eve Wexler, we request leave to file the Eastern District of New York decision in *Delgado v. Ocwen Loan Servicing, LLC*, 2016 WL 4617159, (September 2, 2016) (decision attached), as additional authority in opposition to "Defendant's Motion to Compel Arbitration" (Dkt. #18).

    We believe that this opinion may assist the Court and request leave to file it as additional authority.

                                         /s/ Shimshon Wexler

2016 WL 4617159
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Margarita Delgado, William Sheppard, Naihuai Xu, Geraldine Mahood, Kevin Chowning, Lya Chowning, Paul Emmert, Carolyn Toth, Brian Rafacz, Jennifer Hendricks, Cynthia Beniwal, Kimberly Kayes, Brett Ballard, Derek Willis, Katelyn Willis, Laurie Cheamitru, Dale Zimmer, Michael Benhamu, Meghan Fox, Dan Wilkinson, Kent Collier, Barbara Lightcap, William Lightcap, Theresa McCullough, Ben Elliott, Jason Abt, Melanie Borthwick, Nathan May, Cami Peloza, and Terry Oliver, Individually and on Behalf of all Others Similarly Situated, Plaintiffs,
v.
Ocwen Loan Servicing, LLC, Cross Country Home Services, Inc., Sandra Finn, and "John Does 1-10," Defendants.

13-CV-4427 (NGG) (ST)
|
Signed 09/02/2016

## MEMORANDUM & ORDER

NICHOLAS G. GARAUFIS, United States District Judge

 *1 Plaintiffs bring this putative class action against Defendants Ocwen Loan Servicing, LLC ("Ocwen"), Cross Country Home Services, Inc., Cross Country's President Sandra Finn (together "Cross Country"), and John Does 1-10 (collectively, "Defendants"). (Third Am. Compl. ("TAC") (Dkt. 68).) Plaintiffs claim that Defendants engaged in a deceptive check solicitation scheme that led Plaintiffs and other consumers unknowingly to enroll in, and pay monthly fees for, Cross Country's membership and home warranty plans. (Id.¶¶ 60-61.) Plaintiffs bring the following causes of action: violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (id. ¶¶ 251-81); unjust enrichment under the laws of New York, Alabama, Arizona, Colorado, Georgia, Idaho, Indiana, Maryland, Michigan, New Mexico, Ohio, Pennsylvania, Tennessee, Texas, Virginia, and Washington (id. ¶¶ 282-91); breach of fiduciary duty under the laws of Alabama, Arizona, California, Georgia, Indiana, Michigan, New Jersey, New Mexico, Ohio, Virginia, and Washington (id. ¶¶ 291-300); and violations of multiple state consumer protection and unfair trade practices statutes (id. ¶¶ 300-489). [1]

Before the court are Defendants' motion to dismiss the TAC (Joint Mot. to Dismiss (Dkt. 92)), and Cross Country's motion to stay and compel arbitration (the "arbitration motion") directed at thirteen Plaintiffs. [2] (Mot. to Compel Arbitration ("Arb. Mot.") (Dkt. 94)). Cross Country has also filed motions to strike notices of supplemental authority which Plaintiffs submitted in opposition to the arbitration motion. (First Ltr.-Mot. to Strike (Dkt. 117-1); Second Ltr.-Mot. to Strike (Dkt. 127).) For the following reasons, the court DENIES Cross Country's motions to strike and DENIES WITHOUT PREJUDICE Cross Country's motion to compel arbitration, pending a trial on the issue of whether the thirteen Plaintiffs at issue each formed a contract with Cross Country. The court DENIES WITHOUT PREJUDICE Defendants' motion to dismiss, pending the result of the trial on the issue of contract formation and, if necessary, a determination whether the thirteen Plaintiffs are obligated to arbitrate their disputes.

## I. BACKGROUND

### A. Facts
 *2 The following facts are drawn from the TAC and are presumed to be true for the purpose of this Memorandum and Order.

#### 1. The Parties

Ocwen is a loan servicing company and the largest servicer of subprime mortgage loans in the country, servicing more than 600,000 residential home loans. (Id. ¶¶ 44, 55.) Ocwen is paid by loan owners—such as banks or investors—to collect mortgage payments from mortgagors and to handle procedures such as delinquencies, modifications, and foreclosures on the loan owners' behalf. (Id. ¶ 55.) Ocwen and other loan servicers send out monthly invoices to mortgagors to collect payments, and mortgagors

increasingly interact primarily with their loan servicers rather than with the loan owners themselves. (Id. ¶ 57.)

Cross Country is a corporation that markets and sells appliance warranty plans, homeowner repair and referral plans, and related maintenance plans to homeowners. (Id. ¶ 58.) Cross Country operates through subsidiaries and affiliated companies that it controls, which in turn operate in several states, including the states named in the TAC. (Id.) Cross Country has increased its customer base by partnering with consumer finance companies such as mortgage servicers—like Ocwen—and banks. (Id. ¶ 59.) Cross Country's advertising materials tell potential partners that its "add-on products ... increase revenue," and that its "home service plans ... create long-term impact to your bottom line." (Id.) Cross Country and Ocwen partnered together for this purpose. (Id.)

2. The Alleged Check Solicitation Scheme

As early as 2007, Cross Country collaborated with Ocwen to send mailings to all of Ocwen's loan service customers across the country, soliciting their enrollment in various warranty and service plans. (Id. ¶¶ 60, 98.) The solicitations were in the form of a foldout check mailer displaying Ocwen's logo and bearing the words "**CHECK ENCLOSED**" in large, bold print on the front of the envelope. (Id. ¶¶ 62; id., Ex. ("Ex.") (Dkt. 68-1) at 2 (emphasis in original).) [3] The return address under Ocwen's logo lists "Ocwen" and a post office box in Fort Lauderdale, Florida. (Id.) The envelope is addressed to the Ocwen customer directly, and it states that the enclosed check has been "Issued to" the customer. (Id. ¶ 66; Ex. at 2.) Enclosed is a valid, negotiable check made out to the Ocwen customer for a small amount such as $2.50. (Id. ¶ 69; Ex. at 2.) Cross Country's name appears only in small print on the backside of the detachable envelope. (Id.) The payor of the check is listed as "CCHS," and the payor's address is listed as a different post office box, also in Fort Lauderdale, Florida. (Id.) The last three digits of the post office box number on the check differ from those in the envelope's return address, but the addresses otherwise appear the same. (Id.) Although it is difficult to read, Firm's signature appears at the bottom of the check above the words "authorized signature." (Id.) The check does not disclose that Finn is the president of Cross Country and not an "authorized" representative of Ocwen. (Id. ¶ 70; Ex. at 2.) Neither the envelope nor the check is labeled as a solicitation.

*3 Accompanying the check is a sales pitch for the specific Cross Country plan being marketed. (Id. ¶ 80; Ex. at 3.) The language varies according to the particular plan, but the pitch typically exhorts the recipient to cash the check and highlights the savings that will result. (See id. ¶¶ 82-84; Ex. at 3 ("**Simply cash or deposit the attached check and *we'll* pay *you* to see for yourself the rewards and benefits of Referral Assistant 24.**"), 5 ("**The enclosed Check is made in *your name.*** It's yours to cash so please **do not throw it away.** Bring it to your bank by May 31, 2013, sign the back and get your $2.50 instantly.") (emphases in original).) [4]

Certain disclosures or disclaimers are included in the solicitation materials. Above the check's dollar amount in typeface smaller than the surrounding text—i.e., the check number, date, and amount—is a warning that, "[b]y cashing or depositing this check, you are purchasing the annual [home warranty plan]." (Id.; Ex. at 2, 4.) Nothing on the front of the check mentions "enrollment," or discloses that by cashing or depositing the check the customer will be subject to a monthly membership fee. (Id.) The back of the check contains a more detailed disclosure in fine print above the signature line, which in one example states:

> By cashing or depositing this check, I understand that I am purchasing an annual Systems MD Gold Home Service Plan and understand that $44.95 per month will automatically be charged to my Ocwen Loan Servicing mortgage payment unless I cancel my Plan by calling toll-free 1.800.474.4047 within 30 days from the date this check is cashed or deposited. I understand that this is an annually renewable Plan and the monthly cost of $44.95 will continue to be collected with my monthly mortgage payment until I cancel the Plan.

(Ex. at 5.) Cross Country's full name does not appear anywhere on the check itself. (Id.) The insert includes a paragraph containing a very similar disclosure near the end of the sales pitch. (Ex. at 3, 5.) In addition, the enclosure states that customers should expect to receive

an agreement concerning the home warranty plan within seven to ten days of cashing the check. (Id.)

Upon cashing or depositing the check, the customer is enrolled in the warranty or service plan for a 30-day trial period during which the plan can be cancelled without incurring any charges. (Id. ¶ 87.) However, Plaintiffs claim that customers often cannot fully review the benefits of the plans during this 30-day period because Cross Country does not provide customers with any information about the plans or how to use them for at least seven to ten days. (Id.) In addition, the customer cannot actually try out the benefits of the home warranty plan during this time because the solicitation does not contain information about how to contact Cross Country or redeem the benefits, and there are many limitations and exemptions that apply during the trial period. (Id.)

After the trial period, the customer is enrolled in an annual membership for which Cross Country assesses a monthly fee, resulting in total annual costs of more than $500. (Id. ¶¶ 4, 88.) Ocwen and Cross Country divide these fees between themselves without disclosing this arrangement to the customers. (Id. ¶ 64.) Ocwen bills these charges as a line item on the customer's monthly mortgage statements and refers to the fees in escrow statements and other notices issued by Ocwen. (Id. ¶¶ 90-91.) These bills and notices list the fees as "optional insurance," "home warranty," "Systems MD Gold," or other names that do not clearly indicate that the plans are provided by Cross Country rather than Ocwen. (Id. ¶¶ 91-92.) In some instances, Ocwen charges several dollars more per month than the amount listed in the fine print on the check solicitations. (Id. ¶ 8.) Furthermore, Plaintiffs allege that Ocwen has an undisclosed policy of not billing for the new plans until one or two mortgage payment cycles later, thus increasing the possibility that customers will not realize that the new charges are related to their cashing or depositing of the check. (Id. ¶ 64.)

**\*4** Plaintiffs allege that customers were intentionally misled by the solicitations, with many believing that the checks were rebates or refunds from their mortgage servicer, Ocwen. (Id. ¶ 70.) Plaintiffs further note that many of Ocwen's customers make their mortgage payments by automatic deductions from their bank accounts, thus making it less likely that these customers would carefully inspect their monthly mortgage bills or notice fees for products that they did not explicitly purchase. (Id. ¶¶ 93-94.)

Plaintiffs allege that Defendants were well aware of the fact that customers do not use the plans, either because they are unaware that they are enrolled, or because they have found the plans to be useless. (Id. ¶ 95.) Furthermore, Plaintiffs maintain that Defendants are aware that many customers have complained about this solicitation scheme and have felt that they have been cheated. (Id.) The TAC incorporates postings from the website "Pissed Customer," in which other purported Ocwen customers share complaints about being similarly deceived by the solicitations. (Id. ¶ 96.) Plaintiffs claim that Defendants' entire scheme is designed to deceive customers and increase their mortgage costs without their knowledge. (Id. ¶ 64.)

### 3. Plaintiffs' Experience with Defendants' Check Solicitations

*a. The New York Plaintiffs*

Plaintiffs Margarita Delgado and William Sheppard (the "Delgados") are a married couple residing in New York, with a home mortgage serviced by Ocwen. (Id. ¶ 18.) In or around August 2011, Cross Country sent the Delgados a solicitation for the "Systems MD Gold Home Warranty Plan." (Id. ¶¶ 98, 100.) As with the other solicitations, the envelope listed only Ocwen as the sender, and the enclosed check listed "CCHS" as the payor. (Id. ¶ 99.) The check was made out to William Sheppard for $2.50. (Id. ¶ 98.) The Delgados deposited the check on November 23, 2011, unaware that by endorsing the back of the check, Defendants would enroll the Delgados in the warranty plan and begin charging them a monthly membership fee. (Id. ¶ 100.)

On or about December 20, 2011, Ocwen sent the Delgados a notice on Ocwen letterhead, listing an interest rate change on their loan and a resulting adjusted mortgage amount. (Id. ¶ 101.) The notice also listed a line item of $48.72 for "Optional Ins." (Id.) The phrase "Optional Ins." was not included in the solicitation that the Delgados had received in August 2011. (Id.) Beginning in 2012, Ocwen started assessing $48.72 on the Delgados' monthly mortgage bill statements. (Id. ¶ 102.) This sum was nearly $4 more than the $44.95 monthly charge that had been

disclosed in the fine print on the back of the solicitation check, (Id.) The bills came from Ocwen and did not mention Cross Country. (Id.) The Delgados continued to make their monthly loan payments, including the additional fee, from January 2012 through October 2012 because they misunderstood the nature of the charge, and Ocwen had warned them that missed or late payments could result in late fees or damage to their credit. (Id. ¶ 106.)

In September 2012, after paying nearly $500 in warranty plan charges, the Delgados contacted Ocwen to inquire about the $48.72 monthly charge. (Id. ¶ 107.) Ocwen directed the Delgados to call an 800 number, which they later learned belonged to Cross Country, a company that the Delgados had never heard of. (Id. ¶ 108.) Once the Delgados learned that they had mistakenly signed up for a third party warranty plan, they demanded a refund. (Id. ¶¶ 109-10.) Both Ocwen and Cross Country refused to refund the money, and Cross Country refused to provide the Delgados with a copy of the solicitation pitch that accompanied the check or the plan agreement that Cross Country claimed to have sent. (Id.)

### b. The California Plaintiffs

**\*5** Plaintiff Naihua Xu is a citizen of California with a mortgage serviced by Ocwen. (Id. ¶ 19.) His interaction with Defendants was similar to that of the Delgados. (See id. ¶ 111-15.) However, Xu's payments to Ocwen were set up through an automatic bank account withdrawal system that was supposed to limit the withdrawal amount to only his mortgage payment; therefore, Xu did not suspect that additional charges could be added to his mortgage payment without his express permission to increase the automatic withdrawal amount. (Id. ¶ 116.)

Plaintiff Geraldine Mahood is also a citizen of California with a mortgage serviced by Ocwen. (Id. ¶ 20.) Like the other Plaintiffs, Mahood deposited the solicitation check without knowing that by endorsing the back of the check, Cross Country would enroll her in a warranty plan and charge a monthly membership fee. (Id. ¶¶ 118-19.)

### c. Additional Named Plaintiffs

The TAC alleges new claims under the laws of 16 additional states, with named Plaintiffs in each state bringing claims on their own behalf and on the behalf of putative state classes.[5] Each state's named Plaintiffs allege substantially similar facts about their experiences with the check solicitation scheme and their interactions with Defendants, with the exception that the specific warranty plans had different names, the initial checks varied in value between $2.50 and $4.00, and the monthly charge amounts varied between $14.96 and $58.80. (See id. ¶¶ 122-237.)

### B. Procedural History

On August 6, 2013, the Delgados filed the original Complaint seeking individual and class-based relief. (Compl. (Dkt. 1).) On November 15, 2013, Plaintiffs filed the First Amended Complaint (the "FAC"), adding the California Plaintiffs and their corresponding claims under California law. (FAC (Dkt. 25).) On February 25, 2014, Defendants filed separate motions to dismiss. (Ocwen Mot. to Dismiss (Dkt. 33); Cross Country Mot. to Dismiss (Dkt. 34).) Plaintiffs then requested leave to supplement the FAC under Federal Rule of Civil Procedure 15. (Mot. to Suppl. Compl. (Dkt. 40).) On September 24, 2014, the court denied Plaintiffs leave to supplement the FAC and granted in part Defendants' motions to dismiss. Delgado v. Ocwen Loan Servicing, LLC, No. 13-CV-4427 (NGG) (RML), 2014 WL 4773991, at \*1 (E.D.N.Y. Sept. 24, 2014) ("Delgado I"). Specifically, the court dismissed with prejudice Plaintiffs' claims under the California Consumer Legal Remedies Act (the "CLRA"), id., 2014 WL 4773991, at \*13, Plaintiffs' claims for unjust enrichment under California law, id., 2014 WL 4773991, at \*23, and Plaintiffs' claims for breach of fiduciary duty under New York law, id., 2014 WL 4773991, at \*25. The court dismissed without prejudice Plaintiffs' California Unfair Competition Law ("UCL") claims under the CLRA. Id., 2014 WL 4773991, at \*14. Plaintiffs' claims under RICO, New York General Business Law § 349, California's UCL, New York's unjust enrichment law, and California's fiduciary duty law all survived Defendants' first round of dismissal motions. Id., 2014 WL 4773991, at \*11, \*16, \*22-23, \*25.

**\*6** On November 20, 2014, Plaintiffs filed the Second Amended Complaint. (Second Am. Compl. (Dkt. 53).) However, the parties later stipulated to the filing of the TAC in order to allow Plaintiffs to withdraw certain

claims and consolidate a related case by adding Meghan Fox as a named Plaintiff asserting claims under New Jersey law. (See Stipulation (Dkt. 66) (citing Fox v. Ocwen Fin. Corp., et al., No. 15-CV-464 (DLI) (MDG) (E.D.N.Y.)).) Plaintiffs filed the TAC on April 9, 2015.

On August 31, 2015, Defendants filed the fully briefed motion to dismiss, and Cross Country filed the fully briefed arbitration motion. Defendants do not move to dismiss Plaintiffs' consumer fraud claims under the state laws of Colorado, Michigan, New Jersey, New Mexico, or Texas; accordingly, those claims survive. (See Pls.' Opp'n at 2.) The thirteen named Plaintiffs whom Cross Country seeks to compel to arbitration are: Carolyn Toth and Brian Rafacz of Arizona; Cynthia Beniwal and Kimberly Kayes of Georgia; Derek and Katelyn Willis of Indiana; Michael Benhamu of New Jersey; Theresa McCullough of Pennsylvania; Ben Elliott of Tennessee; Matthew and Cami Peloza and Terry Oliver of Washington; Dan Wilkinson of New Mexico; and Brett Ballard of Idaho. (See Arb. Mot. at 1 n.1.)

## II. MOTION TO COMPEL ARBITRATION

Cross Country moves to stay these proceedings and compel thirteen named Plaintiffs to arbitration pursuant to § 4 of the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 1 et seq. In doing so, Cross Country seeks to enforce the provisions of the particular home service agreements, which Cross Country maintains provide for the mandatory arbitration of all disputes. (Arb. Mot. at 10.) Plaintiffs have filed their opposition to the motion (Pls.' Mem. in Opp'n to Def.'s Mot. to Stay ("Pls.' Arb. Opp'n") (Dkt. 94-7)), and Cross Country has filed a reply in support of the motion (Defs.' Reply Mem. in Supp. ("Defs.' Arb. Reply") (Dkt. 94-9)). The court addresses the arbitration motion before the motion to dismiss, as a determination that a Plaintiff is compelled to arbitrate his or her dispute would require the court to stay proceedings as to that Plaintiff, pending the result of arbitration.

### A. Motions to Strike Notices of Supplemental Authority

As an initial matter, the court addresses Cross Country's motions to strike two notices of supplemental authority that Plaintiffs have filed subsequent to completion of the briefing on the arbitration motion. (See Not. of Suppl. Authority (Dkt. 115); Second Not. of Suppl. Authority (Dkt. 125); Ltr.-Mot. to Strike; Second Ltr.-Mot. to Strike.)[6] Plaintiffs have filed responses in opposition to Cross Country's motions to strike. (See Mem. in Opp'n (Dkt. 120); Second Mem. in Opp'n (Dkt, 131)). Cross Country objects to Plaintiffs' first notice on the ground that it is a procedurally improper sur-reply in opposition to the arbitration motion. (Ltr.-Mot. to Strike at 2.) Cross Country argues further that the notice (1) consists of non-controlling cases from outside the Second Circuit, (2) introduces evidence that is not authenticated and therefore is not in admissible form, and (3) introduces opinion testimony from an unqualified expert whom Defendants have not yet deposed. (Id. at 2, 4.) Cross Country objects to Plaintiffs' second notice on the ground that "Plaintiffs failed to request permission to file supplemental authority" and that the notice introduces old case law from outside the Second Circuit that pre-dates Plaintiffs' briefing. (Second Ltr.-Mot. to Strike at 1-2.) For the following reasons, the court denies both motions to strike.

**\*7** The court notes that while its individual rules require parties to file motion papers in accordance with a court-approved briefing schedule, there is no such requirement for notices of supplemental authority. While it would be ideal for parties to discover and submit all relevant case law before a motion is fully briefed, "[i]t is fairly standard practice for parties to occasionally send letters or to otherwise file supplemental authority after briefing is complete." Duprey v. Twelfth Judicial Dist. Court, No. 08-CV-756 (JB), 2009 WL 2951023, at \*3 (D.N.M. Aug. 10, 2009). Furthermore, although cases from other circuits are not controlling legal authority, the court may find the reasoning of other courts helpful in applying the appropriate legal standards to the facts of this case. Therefore, the court will take note of those cases and consider them to the extent they are relevant to the arbitration motion.

Next, with regard to the admissibility of documents attached to Plaintiffs' first notice, the court notes that a motion to compel arbitration is reviewed under a summary judgment standard, and only admissible evidence may be considered. See Fed. R. Civ. P. 56(c)(2); Schnabel v. Trilegiant Corp., 697 F.3d 110, 113 (2d Cir. 2012). However, "[a]t the summary judgment stage, district courts have discretion to consider evidence in inadmissible form, so long as the content would be admissible at trial." Capitol Records, LLC v. Escape Media Grp., Inc., No. 12-CV-6646 (AJN) (SN), 2015 WL 1402049, at \*20 (S.D.N.Y. Mar. 25, 2015). Regardless, in

response to Cross Country's motion to strike, Plaintiffs' counsel submitted a declaration confirming that the 34 contested exhibits included in Plaintiffs' first notice are true and correct copies of documents produced by Cross Country through discovery. (See Decl. of Steven L. Wittels (Mem. in Opp'n, Ex. 1 (Dkt. 120-1)).) Because this evidence is now authenticated and in admissible form, the court sees no reason not to consider it.

Finally, Cross Country Defendants object to Plaintiffs' inclusion of the "preliminary expert report" of Dr. Itamar Simonson, Professor of Marketing at Stanford University Graduate School of Business. (See Ltr.-Mot. to Strike at 4; Not. of Suppl. Authority, Ex. 4 (Dkt. 115-4) (filed under seal).) The court has not considered Dr. Simonson's report and so does not address whether the report would be admissible.

### B. The Relevant Agreements

Cross Country moves to compel arbitration only as to those Plaintiffs who enrolled through the check solicitation in one of two specific plans: the Referral Assistant 24 membership plan ("Referral Assistant") or the Systems MD Gold Home Warranty Plan ("Systems MD"). (Arb. Mot. at 2.) Cross Country markets these plans to consumers across the United States. (Decl. of Jason Ksobiech ("Ksobiech Decl.") (Arb. Mot., Ex. A (Dkt. 94-2)) ¶ 3.)

#### 1. The Referral Assistant Program

Referral Assistant is a membership program that offers discounts and rebates on home maintenance services, home appliance replacements, and home improvement projects. (Id.) At various times between May 2013 and July 2013, Plaintiffs Toth, Rafacz, Beniwal, Kayes, Willis, Benhamu, McCullough, Elliott, Peloza, and Oliver (collectively, "RA Plaintiffs"), enrolled in Referral Assistant by endorsing and depositing an enrollment check, received as part of the check solicitation mailing described previously. (See id. ¶ 10.) Plaintiffs claim that they believed the check came from Ocwen, not Cross Country, and each believed that the check was a small rebate or adjustment of their Ocwen mortgage account. (Decl. of Steven L. Wittels ("Wittels Decl.") (Pls.' Arb. Opp'n, Attach. 1 (Dkt. 94-8), Exs. A-J, W-CC.) Plaintiffs claim that none of them thought that by endorsing the check they were signing a contract with Cross Country, or that by depositing the check they would be charged monthly fees on top of their Ocwen mortgage bills. (Id., Exs. A-V.)

**\*8** The solicitation letter accompanying the checks indicated that enrollees would receive a "Home Service Agreement" containing the terms and conditions of their membership within seven to ten days of cashing or depositing the check. (Ksobiech Decl. ¶ 9.) The solicitation letter also indicated that enrollees would be granted a 30-day trial period, during which time they could review the terms of membership and withdraw their enrollment at no charge. (Id.) None of the RA Plaintiffs withdrew from the program during the 30-day trial period, with some continuing to be charged monthly membership fees for a year or more. (Id. ¶¶ 17, 20, 23, 26, 29, 32, 35, 38, 41, 44, 50, 55.)

Cross Country maintains that it sent a Home Service Agreement to each RA Plaintiff, (Id. ¶ 11; Decl. of Luis Martinez ("Martinez Decl.") (Arb. Mot., Ex. B (Dkt. 94-3)) ¶¶ 8, 10, 12, 14, 16, 18, 20, 22, 24, 26.) Cross Country further maintains that the agreements are identical. (Ksobiech Decl. ¶ 12.) The mailings take the form of glossy brochures that appear to have been sent by Ocwen, with Ocwen's logo on the front and back. (See id., Exs. 21-30, 33-37.) The exterior of the brochures state "Welcome to Referral Assistant 24" and "Saving Money at [Plaintiff's address] Is Now As Easy As 1 +2 +3!" (See id.) The exterior does not alert customers to any contract or terms included inside, and the words "contract," or "home services agreement" do not appear anywhere within the mailing. (See id.) Plaintiffs maintain that none of them recall receiving these mailings. (TAC ¶ 86; Wittels Decl., Exs. A-J, X, AA.) Contained in each of the agreements is the following clause:

> **MANDATORY ARBITRATION:** ALL DISPUTES, CONTROVERSIES OR CLAIMS ARISING OUT OF OR RELATING TO THE TERMS AND CONDITIONS, INCLUDING THE NEGOTIATION THEREOF, ("DISPUTES") NOT RESOLVED AMICABLY BETWEEN THE PARTIES SHALL BE SETTLED BY FINAL AND BINDING ARBITRATION CONDUCTED IN THE COMMONWEALTH OF MASSACHUSETTS OR OTHER MUTUALLY AGREED LOCATION, BY ONE NEUTRAL ARBITRATOR, IN ACCORDANCE WITH THIS AGREEMENT

AND THE THEN CURRENT COMMERCIAL ARBITRATION RULES AND SUPPLEMENTARY PROCEDURES FOR CONSUMER-RELATED DISPUTES OF THE AMERICAN ARBITRATOR ASSOCIATION ("AAA"). The arbitrability of Disputes, including any dispute over the interpretation, scope, or validity of this contract or the arbitration clause, shall also be determined by the arbitrator.

(Ksobiech Decl. ¶ 13.)

### 2. The Systems MD Program

Systems MD is a home warranty plan that insures against the cost of repair, maintenance, and replacement of home systems and appliances. (Id. ¶ 3.) Plaintiffs Ballard and Wilkinson (collectively, "MD Plaintiffs") enrolled in Systems MD in November 2011 and November 2012, respectively, by endorsing and depositing enrollment checks distributed through the aforementioned check solicitation. (See id. ¶¶ 46, 52.) As with Referral Assistant, the solicitation letters accompanying the checks indicated that consumers would receive a Home Service Agreement with terms and conditions of membership within seven to ten days of cashing or depositing the checks, and explaining the 30-day trial period. (Id. ¶ 45.) Like RA Plaintiffs, MD Plaintiffs claim that none of them thought that by endorsing the check they were signing a contract with Cross Country, or that by depositing the check they would be charged monthly fees on top of their Ocwen mortgage bills. (Wittels Decl., Exs. A-V.)

Cross Country maintains that it sent identical Systems MD agreements to Ballard and Wilkinson on November 25, 2011, and November 26, 2012, respectively. (Ksobiech Decl. ¶¶ 28, 31.) Plaintiffs maintain that neither of them recalls receiving these mailings. (TAC ¶ 86; Wittels Decl., Exs. A-J, X, AA.) The Systems MD agreements have a one-year term, and they renew annually unless cancelled by an enrollee in accordance with specific cancellation provisions. (Id.) Cross Country maintains that it sent renewal notices to MD Plaintiffs approximately two months before the memberships were set to renew for a new annual term. (Id. ¶¶ 48, 49, 54; Martinez Decl. ¶ 29, 32.) The renewal notices contained the same updates to the terms and conditions of the agreements, including the addition of the following disclosure at the top of the page: "This Agreement has provisions of the use of final and binding arbitration to resolve disputes and otherwise limits the remedies available to you." (Ksobiech Decl. ¶ 49.) Below the subtitle "Dispute Resolution," the notice includes the following provision:

*\*9* **1. ARBITRATION:** All disputes, controversies, or claims of any sort, arising out of or in any way relating to this Agreement, its negotiation, and the Services provided pursuant to it, whether based in contract, tort, regulation, or any other legal or equitable theory (collectively, "Disputes"), shall be resolved at the consumer's choice by settlement or final and binding arbitration or in and through a small claims court having jurisdiction over such Disputes.... The arbitrator is empowered to decide all Disputes and all questions related to the enforceability and scope of these Dispute Resolution provisions, including but not limited to the validity, interpretation and applicability of these Dispute Resolution Provisions. Additionally, this transaction involves interstate commerce, and these Dispute Resolution provisions shall be governed by the Federal Arbitration Act, as amended (9 USC 1). No arbitration may proceed on a class or representative basis, and the arbitrator may not consolidate any arbitration proceeding governed by these Dispute Resolution Provisions with any other person's arbitration proceeding, and may not otherwise preside over any form or a representative or class proceeding[.]

(Id.)

The renewal notice notified MD Plaintiffs that they could reject the revised terms and conditions by cancelling their Systems MD memberships within 30 days of the contract renewal date. (Id.) By not affirmatively cancelling their memberships, MD Plaintiffs were automatically renewed for new annual terms. Plaintiff Ballard did not cancel his membership until March 2015. (Id. ¶ 50.) Plaintiff Wilkinson did not cancel his membership until October 2014. (Id. ¶ 55.)

### C. Legal Standard

Congress enacted the FAA to establish a "federal policy favoring arbitration," requiring federal courts to "rigorously enforce agreements to arbitrate." Shearson/Am. Exp., Inc. v. McMahon, 482 U.S. 220, 226 (1987). Section 2 of the FAA provides that "[a] written provision in a contract evidencing a transaction involving commerce

to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable."

"The threshold question facing any court considering a motion to compel arbitration is ... whether the parties have indeed agreed to arbitrate." Schnabel, 697 F.3d at 118. Since arbitration is a matter of contract between the parties, "courts must rigorously enforce arbitration agreements according to their terms." Am. Express Co. v. Italian Colors Rest., 133 S. Ct. 2304, 2309 (2013) (internal quotation marks omitted). In determining whether the parties agreed to arbitrate, the appropriate standard of review is equivalent to the summary judgment standard. See Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003); see also Klein v. ATP Flight Sch., LLP, No. 14-CV-1522 (JFB) (GRB), 2014 WL 3013294, *3 (E.D.N.Y. July 3, 2014). As a result, "allegations related to the question of whether the parties formed a valid arbitration agreement" are evaluated to determine "whether they raise a genuine issue of material fact that must be resolved by a fact-finder at trial." Schnabel, 697 F.3d at 113.

Section 2 of the FAA envisions two types of challenges to a contract containing an arbitration clause: "those that challenge the contract as a whole, and those that challenge the arbitration clause in particular." Ipcon Collections LLC v. Costco Wholesale Corp. ("Ipcon II"). 698 F.3d 58, 61 (2d Cir. 2012) (citing Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 444 (2006)). If the challenge is to "the arbitration clause itself—an issue which goes to the making of the agreement to arbitrate—the federal court may proceed to adjudicate it." Buckeye Check Cashing, 546 U.S. at 445 (quoting Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 403-04 (1967)); see also Buckeye Check Cashing, 546 U.S. at 445 (holding that "as a matter of substantive federal arbitration law, an arbitration clause is severable from the remainder of the contract"). However, "a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator." Id. at 449.

Nevertheless, the Second Circuit has long recognized a limited exception to the requirement of arbitration for general contract challenges where a party attacks the very existence of a contract in the first place. See Ipcon II, 698 F.3d at 61; Telenor Mobile Commc'ns AS v. Storm LLC, 584 F.3d 396, 406 n.5 (2d Cir. 2009) ("[Q]uestions about whether a contract was ever made ... are presumptively to be decided by the court even without a specific challenge to the agreement to arbitrate." (emphasis in original)); Moore v. T-Mobile USA Inc., No. 10-CV-527 (SLT) (CLP), 2010 WL 5817656, at *4 (E.D.N.Y. Nov. 8, 2010) (noting that Buckeye was limited to disputes challenging the validity, rather than the existence, of a contract containing an arbitration agreement), report and recommendation adopted, No. 10-CV-527, 2011 WL 609818 (E.D.N.Y. Feb. 15, 2011); McCaddin v. Se. Marine Inc., 567 F. Supp. 2d 373, 378 (E.D.N.Y. 2008) (recognizing "that under well-settled Second Circuit law any triable issues of fact regarding fraud in the execution must be addressed by the court and not the arbitrator"). The Supreme Court confirmed this limited exception in Granite Rock Co. v. International Brotherhood of Teamsters, 561 U.S. 287 (2010). See id. at 296 ("It is similarly well settled that where the dispute at issue concerns contract formation, the dispute is generally for courts to decide."); Dedon GmbH v. Janus et Cie, 411 Fed.Appx. 361, 363 (2d Cir. 2011) ("Granite Rock reconfirms this circuit's well-established precedent that where a party challenges the very existence of the contract containing an arbitration clause, a court cannot compel arbitration without first resolving the issue of the contract's existence." (citing Interocean Shipping Co. v. Nat'l Shipping & Trading Corn., 462 F.2d 673, 676 (2d Cir. 1972))). [7]

**D. Discussion**

1 The Nature of Plaintiffs' Challenge to Arbitration

**\*10** The crux of Cross Country's arbitration motion is that Plaintiffs are subject to valid arbitration agreements, with terms and conditions of which Plaintiffs had notice, and to which Plaintiffs objectively assented when they declined to terminate their enrollment within 30 days and continued to pay monthly membership charges. (See Arb. Mot. at 9-23.) The arbitration motion therefore anticipates what might appear to be a relatively straightforward challenge to the arbitration agreement itself. See Buckeye Check Cashing, 546 U.S. at 445 (holding that "an arbitration clause is severable from the remainder of the contract" and that if the challenge is to "the arbitration clause itself—an issue which goes to the making of the agreement to arbitrate—the federal court may proceed to adjudicate it" (citations omitted)). The court does not address those arguments at this

time, however, because Plaintiffs have also challenged the formation and existence of the contract as a whole. (See Pls.' Arb. Opp'n at 13-17.) [8]

In Plaintiffs' opposition to the arbitration motion, they argue that they cannot be compelled to arbitrate their dispute because no contract exists between them and Cross Country at all. (Id.) Plaintiffs frame their argument as one alleging fraud in the factum, otherwise known as fraud in the execution of the contract. (See id. at 13 ("The check signatures Cross Country relies on as evidence of contract formation were obtained through fraud in the factum.").) Plaintiffs maintain that Cross Country obtained their check signatures by materially misrepresenting the "true nature" of the documents Plaintiffs were signing and that, therefore, assent was ineffective and no contracts were formed. (See id. at 13-14 (citing Langley v. Fed. Deposit Ins. Corp., 484 U.S. 86, 94 (1987) (describing fraud in the factum as "the sort of fraud that procures a party's signature to an instrument without knowledge of its true nature or contents")).) See also Cancanon v. Smith Barney, Harris, Upham & Co., 805 F.2d 998, 1000 (11th Cir. 1986) ("Where misrepresentation of the character or essential terms of a proposed contract occurs, assent to the contract is impossible. In such a case there is no contract at all.").

Cross Country responds first by arguing that any challenge to a contract as a whole rather than to the arbitration clause specifically—including challenges alleging fraud in the factum—must be determined by an arbitrator. (See Defs.' Arb. Reply at 1 ("Plaintiffs' arguments fail, however, as Supreme Court and Second Circuit authority prohibit trial courts from hearing attacks on the validity of contract formation, instead compelling that this determination be made by the arbitrator."); id. at 2 ("[T]he Supreme Court has clarified that any attack on the validity of a contract that contains an arbitration provision shall be determined by the arbitrator—not the trial court—regardless of whether the party opposing arbitration alleges the contract was void or voidable." (citing Buckeye Check Cashing, 546 U.S. at 445-46)).) In essence, Cross Country insists that the legal basis for Plaintiffs' argument has not survived Buckeye. (See id. at 3 ("Tellingly, Plaintiffs' citations for the proposition that fraud in the factum claims are not subject to arbitration all pre-date the Supreme Court's decision in Buckeye.").) However, it is Cross Country that has erred in its interpretation of the relevant case law.

As explained above, the Supreme Court in Granite Rock confirmed the Second Circuit's well-established precedent that "where the dispute at issue concerns contract formation, the dispute is generally for courts to decide." 561 U.S. at 296; see also Dedon GmbH, 411 Fed.Appx. at 363. Furthermore, a challenge alleging fraud in the factum or execution clearly concerns contract formation. See McCadden, 567 F. Supp. 2d at 378 ("[C]ourts, rather than arbitrators, should address claims related to whether there was a contract in the first place—that is, whether there was fraud in the execution of the contract."); Restatement (Second) of Contracts § 163 ("If a misrepresentation as to the character or essential terms of a proposed contract induces conduct that appears to be a manifestation of assent by one who neither knows nor has reasonable opportunity to know of the character or essential terms of the proposed contract, his conduct is not effective as a manifestation of assent."). Therefore, assuming Plaintiffs' allegations state a claim of fraud in the factum, it is the court's role to determine whether a contract exists. [9]

**\*11** Cross Country next argues that even assuming a court must decide a fraud-in-the-factum challenge to contract as a whole, Plaintiffs' allegations actually present a claim of fraud in the inducement. (Defs.' Arb. Reply at 3-6.) The distinction is important because while a claim of fraud in the factum challenges the very existence of a contract, a claim of fraud in the inducement merely challenges a party's obligations under a contract that is acknowledged to exist. See Ipcon I, 2011 WL 3806255, at \*3 ("Fraud in the 'inducement' indicates a misrepresentation that goes to the subject matter underlying the transaction, but does not challenge the fact that an agreement of some kind was reached." (internal quotation marks and citation omitted)); Solymar Invs., Ltd. v. Banco Santander S.A., 672 F.3d 981, 995 (11th Cir. 2012) ("If a party understands the nature of the contract they are executing, but contends that there has been some material misrepresentation as to the obligations rising thereunder, only a fraud in the inducement claim will lie."). A fraud-in-the-inducement challenge therefore attacks the validity, rather than the existence, of the contract as a whole, and such challenges must go to the arbitrator, assuming the validity of the arbitration clause. See Buckeye, 546 U.S. at 445 ("[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance,"); Prima Paint Corp., 338 U.S. at

403-04 ("[T]he statutory language [of the FAA] does not permit the federal court to consider claims of fraud in the inducement of the contract generally.").

Cross Country argues that Plaintiffs have explicitly alleged fraud in the inducement, pointing to specific instances in the TAC where Plaintiffs use the words "induce" or "inducement." (See Defs.' Arb. Reply at 3; TAC ¶ 265 (alleging that Cross Country "used ambiguous language, formatting, and print size to fraudulently induce Ocwen customers to cash or deposit the checks"); id. ¶ 462 (alleging that Defendants failed "to disclose information concerning Cross Country's plans with the intent to induce consumers to enroll").) Cross Country further argues that because Plaintiffs state all the elements for a claim of fraudulent inducement, the court should interpret the challenge as such. (See Defs.' Arb. Mot. at 4 (citing Johnson v. Nextel Commc'ns, Inc., 660 F.3d 131, 143 (2d Cir. 2011)).) The court disagrees.

The fact that Plaintiffs occasionally used the phrase "fraudulently induce" throughout a 116-page complaint does not bar the court from recognizing a fraud-in-the-factum challenge, particularly because Plaintiffs also bring claims under state consumer fraud statutes with their own elements and statutory language. Likewise, the fact that some of Plaintiffs' allegations might state a claim for fraud in the inducement does not prevent Plaintiffs from opposing the arbitration motion on the basis of fraud in the factum, assuming allegations from the TAC would support such a challenge. In fact, the court sees no reason why a party challenging a contract as a whole on the basis of fraud in the factum could not also present an alternative challenge to the arbitration agreement specifically based on fraud in the inducement. Assuming Plaintiffs have adequately alleged a fraud-in-the-factum challenge to the contract as a whole, the court "cannot compel arbitration without first resolving the issue of the contract's existence." Dedon GmbH, 411 Fed.Appx. at 363. However, should the court resolve that question in the affirmative. Plaintiffs may then be able to challenge the arbitration clause itself as fraudulently induced. See Rent-A-Ctr., W., Inc. v. Jackson, 561 U.S. 63, 71 (2010) ("If a party challenges the validity under § 2 of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement under § 4. [I]f the claim had been 'fraud in the inducement of the arbitration clause itself,' then the court would have considered it." (citing Prima Paint Corp., 388 U.S. at 403-04)); Prima Paint Corp., 388 U.S. at 404 n.12 ("To immunize an arbitration agreement from judicial challenge on the ground of fraud in the inducement would be to elevate it over other forms of contract."); Torres v. Major Auto. Grp., No. 13-CV-0687 (NGG) (CLP), 2014 WL 4802985, at *6 ("Here, because Plaintiff appears to allege fraud in the inducement of the arbitration clause itself, this court is permitted to adjudicate the claim.").

**\*12** At this time, the court need not determine whether Plaintiffs have adequately alleged fraud in the inducement of the arbitration clause specifically, because Plaintiffs have alleged facts that, if proven, would constitute fraud in the factum of the contract generally. Plaintiffs allege that Defendants intentionally deceived them into signing something that they did not realize, or have reason to realize, was a contract. (TAC ¶¶ 64, 70, 95.) If true, this would constitute a misrepresentation as to "the very character of the proposed contract itself." Revak v. SEC Realty Corp., 18 F.3d 81, 91 (2d Cir. 1994); see Ipcon II, 698 F.3d at 62 (noting that a claim of fraud in the factum regards the misrepresentation "as going to very character of the proposed contract itself, as when one party induces the other to sign a document by falsely stating that it has no legal effect" (internal quotation marks and citations omitted)); Hetchop v. Woodlawn at Grassmere, Inc., 116 F.3d 28, 31-32 (2d Cir. 1997) ("Fraud in the execution occurs where there is a 'misrepresentation as to the character or essential terms of a proposed contract,' and a party signs without knowing or having a 'reasonable opportunity to know of its character or essential terms.' " (quoting Restatement (Second) of Contracts § 163)); Torres, 2014 WL 4802985, at *6 ("Fraud in the factum occurs when the maker of a note is tricked into believing that which he is signing is something other than a promissory or obligatory note." (internal citations and alterations omitted)). Because the court finds that Plaintiffs have sufficiently alleged a claim of fraud in the factum of the contract as a whole, the court must determine whether the contract exists before determining whether the parties agreed to arbitrate. See Janiga v. Questar Capital Corp., 615 F.3d 735, 738 (7th Cir. 2010) ("[T]he existence of a contract is an issue that the courts must decide prior to staying an action and ordering arbitration."); Nat'l Fed'n of the Blind v. Container Store, Inc., No. 15-CV-12984 (NMG), 2016 WL 4027711, at *8 (D. Mass. July 27, 2016) (holding that courts must first decide disputes concerning contract formation, and

observing that to do otherwise "would be putting the cart before the horse").

### 2. Whether Issues of Fact Remain

The court finds that Plaintiffs have provided sufficient evidence to substantiate their allegations of fraud in the factum and that issues of fact remain that prevent the court from determining the existence of a contract as a matter of law. [10] Plaintiffs uniformly deny any awareness that by endorsing the checks, they were signing a contract with Cross Country. (Wittels Decl., Exs. A-X.) The fact that none of the Plaintiffs ever used any of the benefits available through the plans lends support to their contention that they were unaware of their membership in the plans. (See id., Exs. K-V, X.) In addition, the design of the check solicitation envelopes and the checks themselves could lead a reasonable juror to conclude that Defendants intended to deceive Plaintiffs as to the nature of the documents they were signing. (See Ksobiech Decl., Exs. 1-10, 31, 35.) Similarly, a reasonable juror could find that by prominently placing Ocwen's logo above the envelope's return address, using a similar address on the check, and omitting any reference to Cross Country's full name on the check, Defendants intended for Plaintiffs to believe that the checks were simply rebates or escrow adjustments from Ocwen, rather than an offer of services from a third party. (See id.) If a jury were to conclude that Defendants materially misled Plaintiffs as to the nature of the checks, then it could reasonably find that Plaintiffs did not manifest assent to contract and that, therefore, no contract was formed. See Restatement (Second) of Contracts § 163. Absent the existence of a contract, the arbitration clauses in the Referral Assistant and Systems MD plans would not apply, and the thirteen Plaintiffs subject to the arbitration motion need not arbitrate their dispute.

Accordingly, the court DENIES WITHOUT PREJUDICE Cross Country's motion to stay and compel arbitration. The case will proceed to trial on the issue of whether the parties formed binding contracts. See Moore, 2010 WL 5817656, at *5 ("Although the Supreme Court has not laid out with particularity exactly how such a determination is to be made, lower courts have held trials and submitted the factual questions to a jury."); PMC, Inc. v. Atomergic Chemetels Corp., 844 F. Supp. 177, 182-83 (S.D.N.Y. 1994) (directing parties to proceed to trial on limited issue of contract formation). The case will be tried before a jury unless the parties inform the court that they consent to an expedited proceeding before the court. Should the trier of fact determine that the parties did form a contract, Cross Country may renew its motion to stay and compel arbitration, and the court will consider whether Plaintiffs have sufficiently challenged the validity of the arbitration clause itself.

### III. MOTION TO DISMISS

*13 Defendants move jointly to dismiss several of the newly added claims in the TAC pursuant to Federal Rules of Civil Procedure 8(a) and 12(b)(6). (Joint Mot. to Dismiss at 1.) However, the court finds that a motion to dismiss is premature given the ongoing arbitration dispute and pending trial regarding contract formation.

The court notes that several of the Plaintiffs that Cross Country seeks to compel to arbitrate are also the sole named Plaintiffs asserting their respective state law claims. Several of these state law claims are also subject to the motion to dismiss. These Plaintiffs, representing five states, are; Cynthia Beniwal and Kimberly Kayes of Georgia; Brett Ballard of Idaho; Derek and Katelyn Willis of Indiana; Ben Elliott of Tennessee; and Cami Peloza and Terry Oliver of Washington. (See Arb. Mot. at 1 n.1; TAC ¶¶ 21-43.) The existence of these Plaintiffs' contracts must first be determined by a trier of fact. (See supra Part II.D.) With respect to these five states, a determination that a contract exists and that these Plaintiffs are obligated to arbitrate their disputes would require the court to stay proceedings pending the result of arbitration. [11] Therefore, any decision now on the motion to dismiss would be incomplete.

While the court could sort through the motion and address only Defendants' arguments for dismissal of state law claims that are not affected by the arbitration challenge, the court is disinclined to take a piecemeal approach in a case that is already fairly complicated. Furthermore, Defendants' dismissal motion no longer matches the TAC, as Plaintiffs have voluntarily withdrawn several of their claims. (See Pls.' Opp'n at 2 n.1; Ltr. Concerning Pls.' Withdrawn Claims.) Accordingly, in the interests of efficiency and simplicity, the court DENIES WITHOUT PREJUDICE Defendants' motion to dismiss, pending the result of the trial as to contract formation and, if necessary, a determination as to whether the thirteen

Plaintiffs are subject to valid arbitration agreements. Should the trier of fact determine that no contracts exist with respect to the thirteen Plaintiffs, Defendants may renew their motion to dismiss, revised to reflect pending claims and contract issues.

## IV. CONCLUSION

For the reasons set forth above, the court DENIES Defendants' motions to strike Plaintiffs' notices of supplemental authority (Dkts. 117-1 & 127); DENIES WITHOUT PREJUDICE Cross Country's motion to stay and compel arbitration (Dkt. 94); and DENIES WITHOUT PREJUDICE Defendants' motion to dismiss (Dkt. 92). The case shall proceed to trial on the limited issue of whether the putative contracts identified in Cross Country's arbitration motion are void due to fraud in the factum. Should the trier of fact determine that the contracts are not void, Cross Country may renew its motion to stay and compel arbitration.

SO ORDERED.

**All Citations**

Slip Copy, 2016 WL 4617159

Footnotes

1 Plaintiffs' state statutory claims are brought under: New York General Business Law § 349; the California Unfair Competition Law; the Alabama Deceptive Trade Practices Act; the Arizona Consumer Fraud Act; the Colorado Consumer Protection Act; the Georgia Fair Business Practices and Uniform Deceptive Trade Practices Acts; the Indiana Deceptive Consumer Sales Act; the Maryland Consumer Protection Act; the New Jersey Consumer Fraud Act and Truth-In Consumer Contract, Warranty, and Notice Act; the New Mexico Unfair Trade Practices Act; the Ohio Consumer Sales Practices Act as to Ocwen only; the Pennsylvania Unfair Trade Practices and Consumer Protection Law; the Tennessee Consumer Protection Act; the Texas Deceptive Trade Practices and Consumer Protection Act; the Virginia Consumer Protection Act; and the Washington Consumer Protection Act. (TAC ¶¶ 300-489.) The TAC also alleged the following claims, which Plaintiffs have since withdrawn: breach of fiduciary duty under Colorado law; breach of fiduciary duty under Idaho law; violations of the Idaho Consumer Protection Act; breach of fiduciary duty under Maryland law; unjust enrichment under New Jersey law; breach of fiduciary duty under Pennsylvania law; breach of fiduciary duty under Tennessee law; and violations of the Ohio Consumer Sales Practices Act, as to Cross Country only. (See Pls.' Opp'n (Dkt. 92-5) at 2 n.1; Ltr. Concerning Pls.' Withdrawn Claims (Dkt. 106).)
2 Cross Country actually names fifteen individuals in the arbitration motion. (See Arb. Mot. at 1 n.1.) However, two of those names—Daniel Toth and Matthew Peloza—are not among the named Plaintiffs in the TAC. (Cf. TAC ¶¶ 18-46.) The court assumes that Daniel Toth is related to Plaintiff Carolyn Toth and that Matthew Peloza is related to Plaintiff Cami Peloza, and the court will treat the arbitration motion as brought against only the thirteen Plaintiffs that are named in TAC.
3 Plaintiffs have attached as an exhibit to the TAC two solicitations that were sent to Plaintiff William Sheppard. (See TAC ¶ 61 n.1; id., Ex.) The exhibit does not have an exhibit number, but it is referenced herein as "Ex." and cited according to ECF page numbers. The court infers that the solicitations received by all Plaintiffs and putative class members were substantially similar to those contained in the exhibit.
4 One sales pitch also states, **"Do not send us a dime to try the Referral Assistant 24 benefits for yourself. Just cash or deposit your check** to get $2.50 instantly and activate all the benefits of Referral Assistant 24.... **A $2.50 check** ... **$40 cash back for gas** ... **Over $1,600 in instant discounts and money back** ...." (Ex. at 3 (emphasis and ellipses in original).)
5 The additional named Plaintiffs assert claims under the laws of the fo llowing states: Alabama (Kevin and Lya Chowning); Arizona (Paul Emmert, Carolyn Toth, and Brian Rafacz); Colorado (Jennifer Hendricks); Georgia (Cynthia Beniwal and Kimberly Kayes); Idaho (Brett Ballard); Indiana (Derek and Katelyn Willis); Maryland (Laurie Cheamitru); Michigan (Dale Zimmer); New Jersey (Michael Benhamu and Meghan Fox); New Mexico (Dan Wilkinson); Ohio (Kent Collier); Pennsylvania (William and Barbara Lightcap and Theresa McCullough); Tennessee (Ben Elliott); Texas (Jason Abt); Virginia (Melanie Borthwick and Nathan May); and Washington (Cami Peloza and Terry Oliver), (See TAC ¶¶ 21-43.)
6 Plaintiffs filed a third notice of supplemental authority on August 30, 2016, drawing the court's attention to the Second Circuit's recent decision in Nicosia v. Amazon.com, Inc., No. 15-CV-423, 2016 WL 4473225 (2d Cir. Aug. 25, 2016). (See Pls.' Third Not. of Suppl. Authority (Dkt. 135).) As explained infra, the court denies the arbitration motion on the basis of Plaintiffs' fraud-in-the-factum challenge to the contract as a whole, and Nicosia is not directly relevant at this stage of the analysis.

7   Some courts—including several district courts within this Circuit—initially interpreted Buckeye as a broad rejection of the distinction between "void," as opposed to merely "voidable," contracts, further narrowing the exception to the requirement of arbitration for general contract challenges and allowing such challenges —if at all—only where based on a lack of signatory power. See, e.g., Ipcon Collections LLC v. Costco Wholesale Corp. ("Ipcon I"), No. 10-CV-9012 (VB), 2011 WL 3806255, at *3 (S.D.N.Y. Aug. 24, 2011) (holding that Buckeye "reversed Second Circuit law which had held that a party could challenge in court, the validity of a contract as void, but not the validity of a contract that was alleged to be voidable" (citation omitted)), aff'd, Ipcon II, 698 F.3d 58; Rubin v. Sona Int'l Corp., 457 F. Supp. 2d 191, 195 (S.D.N.Y. 2006); Titan Pharm. & Nutrition. Inc. v. Med. Shippe Int'l, Inc., No. 05-CV-10580 (SAS), 2006 WL 626051, at *4 (S.D.N.Y. Mar. 13, 2006); see also, e.g., WS Liquidation, Inc. v. Etkin & Co., No. 08-CV-1742 (TFM), 2009 WL 161662, at *3 (W.D. Pa. Jan. 22, 2009) (holding that it was for an arbitrator to decide plaintiffs' general contract challenge where plaintiffs did not argue "that they did not sign the contract, that the contract was signed by someone without autho rity, or that they lacked the capacity to sign the contract"); Reynolds v. Credit Sols., Inc., 541 F. Supp. 2d 1248, 1263 (N.D. Ala. 2008) (holding that Buckeye limited the exception to apply only to challenges to signatory power), vacated sub nom. Picard v. Credit Sols., Inc., 564 F.3d 1249 (11th Cir. 2009).

> However, in the wake of Buckeye the Second Circuit continued to caution that it did not view the Court's decision as necessarily having so broad an effect. See Ipcon II, 698 F.3d at 61 (affirming Ipcon I but clarifying that "a limited exception to the requirement of arbitration for general contract challenges may be available where a party questions whether a contract was ever made" (citations omitted)); Telenor Mobile Commc'ns AS, 584 F.3d at 406 ("We have not modified our previous ruling that such questions about whether a contract was ever made ... are presumptively to be decided by the court even without a specific challenge to the agreement to arbitrate." (emphasis in original) (citing Sphere Drake Ins., Ltd. v. Clarendon Nat'l Ins. Co., 263 F.3d 26, 31-32 (2d Cir. 2001))). The Supreme Court's decision in Granite Rock appears to have vindicated the Second Circuit's approach by clarifying that formation disputes in general require judicial resolution and that the exception to the arbitration requirement for general contract challenges is not limited solely to signatory challenges. See Granite Rock Co., 561 U.S. at 304 n.9 (finding that a dispute regarding a contract's ratification date presents a formation question for judicial resolution, despite the fact that such a dispute is "not on all fours with, for example, the formation disputes we referenced in [Buckeye]").

8   Plaintiffs have also responded to Cross Country's argument that the arbitration clause is valid. (See Pls.' Arb. Opp'n at 17-25.) However, as explained infra, the court denies the arbitration motion on the basis of Plaintiffs' alternative argument —namely, that "any purported contracts between Cross Country and Plaintiffs are void as a matter of law." (Id. at 13.)

9   Although Cross Country is correct that Plaintiffs cite only to pre-Buckeve cases, Plaintiffs' interpretation of the law is in line with the weight of authority post-Buckeye. See, e.g., Moore, 2010 WL 5817656, at *5 ("Given the Supreme Court's recent Granite Rock decision, it is clear that a dispute concerning the actual formation and existence of a contract is to be decided by the court and not an arbitrator,"); McCaddin, 567 F. Supp. 2d at 378; Simply Fit of N. Am., Inc. v. Poyner, 579 F. Supp. 2d 371, 380 (E.D.N.Y. 2008) ("[W]hether an arbitration agreement fails along with a contract embodying that agreement depends on whether the contract itself is 'void' or 'voidable.' " (citations omitted)); Nat'l Fed'n of the Blind v. Container Store, Inc., No. 15-CV-12984 (NMG), 2016 WL 4027711, at *8 (D. Mass. July 27, 2016) ("[W]here a party argues that no contract was formed, the question of the formation or existence of the contract is for the court, rather than the arbitrator.... Holding otherwise would be putting the cart before the horse."); Kum Tat Ltd. v. Linden Ox Pasture, LLC, No. 14-CV-02857 (WHO), 2014 WL 6882421, at *4 (N.D. Cal. Dec. 5, 2014) ("Challenges to a contract's very existence, however, as opposed to its continued validity, are decided by the court."); SBRMCOA, LLC v. Bayside Resort, Inc., 707 F.3d 267, 274 (3d Cir. 2013) ("[The] relevant distinction is between challenges to a contract's validity, which are arbitrable, and challenges to a contract's formation, which generally are not."); Solymar Invs., Ltd. v. Banco Santander S.A., 672 F.3d 981, 989 (11th Cir. 2012) ("[I]ssues concerning contract formation are generally reserved for the courts to decide."); Janiga v. Questar Capital Corp., 615 F.3d 735, 738 (7th Cir. 2010) ("[T]he existence of a contract is an issue that the courts must decide prior to staying an action and ordering arbitration.").

10  The court notes that in deciding Defendants' first round of dismissal motions, the court held that it could not find "as a matter of law that no reasonable consumer would be misled by Defendants' solicitation materials," and observed that this "is not a case where there is no ambiguity that the consumer was entering a contract, leaving only the question of whether the terms of the transaction were disclosed." Delgado I, 2014 WL 4773991, at *9.

11  This is not the case for Arizona and Pennsylvania, however. Each of those states has at least one named Plaintiff that Defendants do not seek to compel to arbitrate. (See TAC ¶¶ 22 (Paul Emmert of Arizona), 36 (William and Barbara Lightcap of Pennsylvania).)

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.