UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------x
EVE WEXLER, on behalf of herself and
all others similarly situated,

                Plaintiff,

    -against-                           **MEMORANDUM AND ORDER**
                                              Case No. 15-CV-0686 (FB) (PK)
AT&T CORP.,

                Defendant.
------------------------------------------------x

*Appearances*

| For the Plaintiff: | For the Defendant: |
|---|---|
| SHIMSON WEXLER, ESQ. | EVAN TAGER, ESQ. |
| 216 West 104th Street #129 | ARCHIS A. PARASHARAMI, ESQ. |
| New York, New York 10025 | Mayer Brown LLP |
| | 1999 K Street NW |
| JAMES S. GIARDINA, ESQ. | Washington, DC 20006 |
| The Consumer Rights Law Group, PLLC | |
| 3104 West Waters Avenue, Suite 200 | |
| Tampa, Florida 33614 | |

**BLOCK, Senior District Judge:**

       Eve Wexler receives wireless phone service from AT&T Mobility, LLC ("Mobility"). Beginning in approximately October 2014, defendant AT&T Corp. ("AT&T")—a separate company—began making unsolicited calls and sending unsolicited text messages to her cell phone. Wexler then brought this putative class action under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. AT&T moves to compel arbitration pursuant to an agreement between Wexler and

Mobility that purportedly covers her claim against AT&T. For the following reasons, the motion is denied.

# I

According to Mobility's records, Wexler (or someone using her account) ordered an iPhone and wireless service from Mobility's website on October 29, 2008. To complete the order, the customer would have had to check a box acknowledging, "I have read and agree to the Service Agreement under the terms and conditions listed above beginning today." Decl. of David Bates, Ex. 1. The "Service Agreement" was presented in a scrolling text box above the acknowledgment; there was also a hyperlink marked "Print Service Agreement." *Id.* A copy of the Service Agreement was sent to the email address associated with the account the next day. Wexler denies accepting the Service Agreement, although she does not deny placing the order.

The Service Agreement contained the following arbitration clause:

> AT&T and you agree to arbitrate all disputes and claims between us. This agreement to arbitrate is intended to be broadly interpreted. It includes, but is not limited to:
>
> 1) claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory;
>
> 2) claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising);

      3) claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and

      4) claims that may arise after the termination of this Agreement.

Decl. of David Bates, Ex. 2. The agreement then defined the parties to the agreement to "include our respective subsidiaries, affiliates, agents, employees, predecessors in interest, successors, and assigns, as well as all authorized or unauthorized users or beneficiaries of services or Devices under this or prior Agreements between us." *Id.*

Mobility revised the arbitration clause in March 2009, but the revised clause is identical in all material respects to the one set forth above. A hard copy of the revised clause was included in its customers' monthly bills.

Wexler's contract with Mobility expired in September 2014. Since that time, she has continued to receive wireless service from Mobility on a month-to-month basis. Mobility contends that her month-to-month service is still subject to the Service Agreement and the arbitration clause.

As noted, Wexler began receiving unsolicited calls and text messages from AT&T in October 2014. The calls and texts—which continued until at least April 2015—all related to "U-verse" television and internet service. In particular, they related to a U-verse account under the name "Paul MacPherson." Wexler has never had a U-verse account under her own or anyone else's name.

U-verse is offered by AT&T; Mobility has no involvement with the service. However, both Mobility and AT&T are wholly-owned subsidiaries of AT&T Inc.

## II

Section 2 of the Federal Arbitration Act ("FAA") provides that arbitration clauses in commercial contracts are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "Section 2 is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). However, it also "reflects the fundamental principle that arbitration is a matter of contract." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 66 (2010). Thus, a court can order a dispute to arbitration only if, under the principles of contract law, "the court is satisfied that the parties agreed to arbitrate *that dispute*." *Granite Rock Co. v. International Bhd. of Teamsters*, 561 U.S. 287, 297 (2010) (citing *First Options, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)). Absent a clear agreement to the contrary—and there is none here—issues concerning the validity and scope of an arbitration agreement are for a court, and not an arbitrator, to decide. *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002).

Mobility's arbitration clause is strikingly broad in two respects. Wexler focuses on the fact that the clause purports to require arbitration of claims against third parties affiliated with Mobility. But it is also unusually broad as to the subject matter it purports to cover. Even agreements traditionally classified as "broad" because they cover all disputes "arising out of" or "relating to" the underlying agreement evidences only the parties' intent "to have arbitration serve as the primary recourse *for disputes connected to the agreement containing the clause.*" *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 225 (2d Cir. 2001) (emphasis added). Mobility's clause, by contrast, is not limited to disputes concerning its service agreement.

There is, in fact, almost no case law addressing such broad arbitration clauses. In *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011), the Supreme Court dealt with the same clause at issue in this case, but the breadth of the clause was not discussed. Rather, the Court held that a rule of California contract law deeming class-action waivers unconscionable in certain circumstances was preempted by the FAA. *See id.* at 344 ("Requiring the availability of classwide arbitration interferes with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA.").

5

In *In re Jiffy Lube International, Inc., Text Spam Litigation*, 847 F. Supp. 2d 1253 (S.D. Cal. 2012), the district court acknowledged *Concepcion*, but nevertheless concluded that an arbitration clause covering "any and all disputes" "would clearly be unconscionable." *Id.* at 1263. It cited *Stein v. Steinkamp*, 318 F.3d 775 (7th Cir. 2003), in which Judge Posner noted the "absurd results" that would follow from an arbitration clause not tethered to an underlying agreement:

> [I]f Instant Cash murdered Smith in order to discourage defaults and her survivors brought a wrongful death suit against Instant Cash. . . , Instant Cash could insist that the wrongful death claim be submitted to arbitration. For that matter, if an employee of Instant Cash picked Smith's pocket when she came in to pay back the loan, and Smith sued the employee for conversion, he would be entitled to arbitration of her claim. It would make no difference that the conversion had occurred in Smith's home 20 years after her last transaction with Instant Cash.

*Id*. at 777. He opined that such results "might be thought unconscionable," *id.* at 778, but did not have to address that issue because the agreement was susceptible of a construction limiting "the duty to arbitrate to disputes arising under 'this Agreement.'" *Id.* at 777.

As far as the parties' and the Court's own research has revealed, *Jiffy Lube* is the only case squarely addressing an arbitration clause as broad as Mobility's. The Court agrees with its colleague in the Southern District of California that such clauses are cause for concern. And the same absurd results that Judge Posner posited would apply here. If Wexler were hit by a Mobility delivery van, or if she tripped over a

6

dangerous condition in a Mobility store, her tort claim would have to go to arbitration. If she bought shares of stock in Mobility and later claimed a decrease in share price was the result of corporate malfeasance, her securities-fraud claim would have to go to arbitration. And since the arbitration clause purports to survive termination of the underlying service agreement, this obligation to arbitrate any claim whatsoever against Mobility would last forever. In fact, the absurd results are even more absurd than those posited in *Jiffy Lube* because the clause would not just cover disputes with Mobility, but would also include any dispute with any of Mobility's affiliates.

AT&T objects that these hypothetical scenarios go far beyond the actual claim in this case. But as in *Steinkamp*, nothing in the arbitration clause itself makes any distinction based on the type of claim involved. *See* 318 F.3d at 777 ("The defendants' lawyer blanched when confronted with such hypothetical cases at oral argument but was unable to suggest a limiting principle."). And even if the Court were inclined to infer a limitation to disputes arising from or related to Wexler's former service agreement with Mobility, such a limitation would not benefit AT&T. Wexler's claim is that AT&T unlawfully left her voicemails and sent her text messages. The only connection to Mobility is that Wexler's phone is on Mobility's network. In the Court's opinion, that happenstance does not mean, in any reasonable sense, that the voicemails and text messages arose out of or are related to Wexler's

7

former service agreement with Mobility. By contrast, in *Drozdrowski v. Citibank, Inc.*, 2016 WL 4544543 (W.D. Tenn. Aug. 31, 2016), cited by AT&T as supplemental authority just prior to oral argument, *see* Letter from Evan M. Tager, Esq. (Sept. 13, 2016), the court reached the unsurprising conclusion that a clause covering "[a]ll Claims relating to your account, a prior related account, or our relationship" covered TCPA claims based on phone calls from a bank regarding a married couple's credit cards with that bank. 2016 WL 4544543 at *7-*8.

Although the Court shares the concerns voiced in *Jiffy Lube*, holding that Mobility's arbitration clause is unconscionably broad would be in tension with *Concepcion*. The Court concludes instead that an arbitration clause that is unlimited in scope presents a question of contract *formation*.

"When deciding whether the parties agreed to arbitrate a certain matter. . . , courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *Kaplan*, 514 U.S. at 944. It is black-letter law that "an essential element of any contract is a mutual intent to be bound." *Martin H. Bauman Assocs. v. H&M Int'l Transp., Inc.*, 567 N.Y.S.2d 404, 407 (1st Dep't 1991), and that "there can be no contract absent a mutual intent to be bound." *Four Seasons Hotel Ltd. v. Vinnik*, 515 N.Y.S.2d 1, 5 (1st Dept. 1987) (citing *Joseph Martin, Jr., Delicatessen v. Schumacher*, 52 N.Y.2d 105, 109 (1981)). It is also true that the

question is not what each party subjectively intended; "it is necessary to look, rather, to the objective manifestations of the intent of the parties as gathered by their expressed words and deeds." *Brown Bros. Elec. Contractors v. Beam Constr. Corp.*, 41 N.Y.2d 397, 399 (1977).

AT&T stresses this objective theory of contract formation in a post-argument letter to the Court. It argues that, "if the operative words of the contract have a definite and precise meaning as to which there is no reasonable basis for a difference of opinion, the requisite meeting of the minds exists *as a matter of law*." Letter from Evan M. Tager, Esq. (Sept. 19, 2016) (citations and internal quotation marks omitted). As elucidated in the letter, AT&T's argument is that there was such a meeting of the minds here because "[t]here can be no reasonable basis for a difference of opinion that 'all disputes and claims' means exactly what it says and that 'affiliates' includes all members of the AT&T corporate family." *Id.* at 2 (quoting arbitration clause).

But the words expressed must be judged according to "what an objective, reasonable person would have understood [them] to convey." *Leonard v. Pepsico, Inc.*, 88 F. Supp. 2d 116, 127 (S.D.N.Y. 1999) (citing *Kay-R Elec Corp. v. Stone & Webster Constr. Co.*, 23 F.3d 55, 57 (2d Cir. 1994)). Notwithstanding the literal meaning of the clause's language, no reasonable person would think that checking a box accepting the "terms and conditions" necessary to obtain cell phone service would

9

obligate them to arbitrate literally every possible dispute he or she might have with the service provider, let alone all of the affiliates under AT&T Inc.'s corporate umbrella—including those who provide services unrelated to cell phone coverage. Rather, a reasonable person would be expressing, at most, an intent to agree to arbitrate disputes connected in some way to the service agreement with Mobility. As explained above, Wexler's claims are not so connected. If a company wishes to bind its costumers to something broader, it must take steps to secure something that a reasonable person would understand as an objective expression of his or her agreement.

Whether framed in terms of unconscionability or contract formation, the end result is the same: the arbitration clause is not enforced. But in the Court's view, the difference in rationale is important. The Supreme Court has said that the FAA's saving clause "preserves generally applicable contract defenses," but that "it does not suggest an intent to preserve state-law rules that stand as an obstacle to the accomplishment of the FAA's objectives." *Concepcion*, 563 U.S. at 343. It then held that California's ban on most class-action waivers presented such an obstacle, even though it applied generally to consumer contracts. *See id.* at 344. It could be argued that deeming an arbitration clause unconscionable because it is too broad likewise applies a general contract defense "in a fashion that disfavors arbitration." *Id.* at 341.

The Court's reliance on the lack of mutual intent, by contrast, is entirely consistent with the FAA because "[a]rbitration under the Act is a matter of consent, not coercion." *Volt Info. Scis., Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989). Indeed, the FAA explicitly limits itself to agreements "to settle by arbitration a controversy thereafter *arising out of such contract or transaction, or the refusal to perform the whole or any part thereof*." 9 U.S.C. § 2 (emphasis added).

## III

For the foregoing reasons, AT&T's motion to compel arbitration is denied.

**SO ORDERED.**

/S/ Frederic Block
FREDERIC BLOCK
Senior United States District Judge

September 30, 2016
Brooklyn, New York

11